DEMOND HARRIS,

vs.

CITY OF LA CROSSE, LA CROSSE POLICE OFFICERS
GRAHAM EDDY, CRAIG TEFF AND SAM CLASON

Case No. 23-cv-0062


EXPERT WITNESS REPORT BY BRIAN L. LANDERS

February 22, 2024

**Table of Contents**
Scope/Terms of Service (3)
Qualifications of Expert (4)
Report (8)
Materials Used (30)
Curriculum Credit Addendum (31)
Publications Addendum (34)
Affiliations Addendum (35)
Expert Experience Addendum (36)

**Scope of Service**

I have been retained by Davey and Goldman Law firm to opine on the detention, arrest, and use of force by the named officers of the La Crosse Police Department on Demon Harris. The incident occurred on February 28, 2020 in the City of La Crosse, County of La Crosse, State of Wisconsin, United States of America.

**Declaration of Service Terms**

I declare that the opinions stated in this report are my own and based on the materials I was provided for review and those documented in this report. I was not directed at any time to frame or alter my opinion either for or against any party in this case. I declare I had no contact with anyone in this case except for general communications with the attorneys involved in this case. I am being compensated $150/hr. for case review, $300/hr. for virtual testimony, and $3200/day for in-person appearances or testimony plus travel time and reimbursements. I have no personal or professional knowledge or experience with any of the defendants, plaintiff, or witnesses identified to me in this case.

**Expert Qualifications of Brian Landers**

**Employment**

I am the owner of LandersCRT, LLC, a consulting firm that specializes in consulting and expert testimony specific to areas of public safety, police practices, and use of force. I started LandersCRT in 2013, and previously worked as a consultant and trainer with BlueboardIT, LLC, which I co-owned. BlueboardIT, LLC was a company that offered web-based learning management systems to public and private clients who wanted to train employees via a web-based application. Part of my duties with BlueboardIT was also to consult law enforcement agency clients on training initiatives, policy development, and remediation training.

I have provided expert witness services and testimony to both public and private entities. I have consulted for and provided testimony as an expert witness in cases decided or pending in Federal and State Courts regarding law enforcement practices, training, policies, and specifically the use of force. I have provided these services to both plaintiffs and defendants in both criminal and civil proceedings throughout the United States. I've been a keynote speaker at state and national conferences on the topics of workplace violence, personal safety protocols, use of force issues, drone usage for public and private services, and critical incident events. I have prepared curriculum and training policies and protocols for my clients on the application of use of force decision-making, use of force options, weapons, self-defense, mitigation of harm to self and others, after care of use of force, and documentation.

I also am employed full-time as a criminal justice faculty member with Madison College, based in Madison, Wisconsin. I have been employed by Madison College since 2002, starting as a part-time instructor in the law enforcement academy. I was hired in 2010 as a full-time instructor and assigned to a program director position in 2011. As a program director, I assisted with the scheduling, curriculum, instructor management, and student issues in the criminal justice department. I was named director of both the State of Wisconsin 520 hour Basic Law Enforcement Academy, the 720 hour Basic Law Enforcement Academy, and the 160 hour Basic Jail Academy at Madison College from 2011-through 2016. I opted to vacate my program director position in 2017 to allow me more time with my family, reduce my travel time, and return to teaching as my primary duty.

As a faculty member, my employment has included instruction in both degree and non-degree offerings. In the degree credit criminal justice program, I instruct courses such as Juvenile Law, Community Policing Strategies, Report Writing, Criminal Investigations, Intro to Corrections, Constitutional Law, Criminology, Professional Development, College Success, Professional Communications, Criminology,  Ethics, Police-Community Relations, Interview and Interrogations, Traffic Theory, Criminal Investigation Theory, and Emergency Management. In non-degree offerings, I have

served as a Master Instructor for Defensive and Arrest Tactics (DAAT), and Master Instructor for Scenario-Based Training.  I was also responsible for coordinating and assisting instructors in the delivery of all basic, advanced, and specialized training in force-related training. This includes training from the basic law enforcement academy, to advanced hands-on and weapons training for current law enforcement, correctional officers, and security officers. I estimate that I have personally trained several thousand law enforcement and private security employees on force-related topics. I have also designed specific curriculum for Madison College on courses such as "Supervisory Investigation of Force Incidents", "Use of Force Review", "Split Cell Active Shooter Response", "Ground Defense", and "Force Transition Training." These are all currently being routinely offered by Madison College for current law enforcement, correctional officers, and private security officers.

As a faculty member, I also advise criminal justice students on academic progress and career readiness. I serve as the lead faculty member in evaluating and teaching portfolio courses for credit for prior learning tracks, am a mentor in the students of color mentoring program and faculty of color mentoring program, and also instruct and supervise students in Madison College's Honors Program. I have been honored with three "Golden Apple" awards as a distinguished faculty member by my students.

I possess a law enforcement instructor status with the Wisconsin Dept. of Justice Training and Standards Bureau as well as tactical instructor status in tactical areas of Vehicle Contacts, Firearms, Defensive and Arrest Tactics, and Tactical Response. I am certified by the Wisconsin Technical College System to teach in criminal justice degree programs and general credit/liberal arts degree programs. I also hold a recognized designation as a Constitutional Law instructor for the State of Wisconsin.

In 2011 I joined the Wisconsin Criminal Justice Coordinator's Council. This council is made up of leaders and supervisors of all criminal justice programs and law enforcement academies in the Wisconsin Technical College System. In 2013, I was elected by my peers as the Vice President of the Council. In 2015, I was elected to be the President of the Council. This council serves as the voice of criminal justice and law enforcement-related training for students to the Wisconsin Department of Justice, Wisconsin Technical College System, the Higher Learning Commission, and the public.

**Law Enforcement Experience**

My law enforcement career began in 1992 when I was hired as a police officer for the City of Wisconsin Dells Police Department. I completed the law enforcement basic training academy in Madison in 1993. In 1995 I was promoted to K-9 Handler, where I handled dual-purpose police K-9 trained in apprehension, tracking, drug detection, and building/area searches. In 2003, I was promoted to Sergeant, and in 2008 I was promoted to Lieutenant. During my career at the police department, I received numerous commendations for exemplary service, bravery, community engagement, and three life-saving awards. I also served as the commander of the drug unit, search

warrant execution team, honor guard, and lead agency trainer. Working for the City of Wisconsin Dells I have been exposed to a high variety of police calls for service, community issues, and situations which required an application of force. My patrol experience also included specific traffic enforcement details to include drug interdiction, operating while intoxicated targeted patrol, traffic direction and enforcement at special events, and motorcycle unit patrol. I also commanded special enforcement and grant-funded traffic enforcement targeted enforcement patrols. I retired from my department at the end of 2010 to accept the full-time faculty position with Madison College.

**Appointments**

My skills and commitment to law enforcement training was recognized through my appointments to several state committees. I was appointed by the Wisconsin Department of Justice to the Law Enforcement Ethics Advisory Committee in 2000 and helped develop the first state-approved ethics and decision-making curriculum to be used by all Wisconsin law enforcement academies and agencies. In 2003 I was appointed by the Wisconsin Department of Justice Tactical Advisory Committee, which developed training protocols and curriculum for all force-related law enforcement training in Wisconsin to include Defensive Tactics, Tactical Response, and Firearms. I also served on the curriculum development team for the Wisconsin Department of Justice on expanding tactical response curriculum to unify police response to active shooter events in our state. Lastly, I was honored to serve the State of Wisconsin Legislature on a special advisory committee on 911 and emergency telecommunications, which resulted in expanding funding and required training for 911 centers throughout Wisconsin.

**Elected Official Experience**

I was elected to the Columbia County (WI) Board of Supervisors, representing District One of the City of Wisconsin Dells in 2006, 2008, and 2010. As a county board supervisor, I was appointed to the Recycling and Solid Waste committee (2006-2008), the Management and Information Services committee (2006-2011), and Human Resources Committee (2008-2011). I resigned from the board in good standing in January 2011, when my teaching duties at Madison College conflicted with daytime board meetings.

In 2011, I was elected Mayor of the City of Wisconsin Dells and was re-elected in 2013, and 2015. As Mayor I provided leadership on all goals, policies, and objectives of the city. I also have statutory authority over the police and fire departments, and serve on the Finance Committee, Public Safety Committee, Legislative Committee, Public Works Committee, Dells-Delton EMS Committee, Dells-Delton Sewerage Committee, and chair the city's Personnel Committee and Parking Committee. I chose not to run for a fourth term as Mayor to spend more time with my family and to expand my consulting business. My Mayoral term concluded on April 17, 2018.

**Education**

My education includes being a 1989 graduate of Wisconsin Dells High School and then entering two years of associate degree studies in Police Science at Madison College. I later graduated summa cum laude from Mount Senario College with a Bachelor's of Science in Criminal Justice and a minor in Pre-Law (2002). I earned my Master's Degree with honors from American Military University in 2017 in Public Administration with an emphasis on Organizational Management. My capstone thesis was on the relationships between ministerial use of force de-escalation policies and its effect on officer safety. This thesis has been published and received national acclaim for its investigative research and finding.

Since 2001, I have earned 44 doctoral credits from Walden University and Liberty University in areas of forensic psychology and criminal justice and completed two residencies in forensic psychology. I am completing my doctoral research at the University of Arizona in the field of Psychology with an emphasis on criminal psychology and justice studies. My research focus is on personality characteristic comparisons between law enforcement officers and diagnosed psychopaths relative to violent incident engagement and post-incident trauma immunity.

**REPORT**

**_Methodology_**

My report will demonstrate that the actions of  Officer Eddy, and named officers of the

La Crosse Police Department were non-compliant with their agency policy, training, and

the generally accepted practices of detention, arrest, and search by law enforcement.

The methodology used is not scientific, rather it is an objective comparison of the

officer's observed and report-supported actions, against the mandates of their policy

and training. Furthermore, I will present peer-reviewed and nationally accredited

literature authored by subject-matter experts in law enforcement, that will demonstrate

proper justification and procedures of detention, arrest, and strip searches to support

my opinion.


**_Summary of Incident_**

On February 28, 2020, Officer Eddy of the La Crosse Police Department initiated

a traffic stop on Mr. Harris for the issuance of two ordinance citations from a previous

incident on February 25, 2020. The justification of the stop, according to Officer Eddy,

was to issue Harris the citations. After Mr. Harris stopped, Officer Eddy's detention was

expanded as he stated he smelled an odor of marijuana. Mr. Harris eventually exited

the vehicle when Officer Eddy and other officers threatened to shatter the windows on

the vehicle. Upon exiting the vehicle, Mr. Harris was immediately seized, and force was

used by Officer Eddy and other officers on Mr. Harris. Mr. Harris was then subjected to

a strip search of his person by members of the La Crosse County Sheriff's Office and

Officer Eddy.

8

**Issue 1: Was the initial traffic stop on Mr. Harris by the La Crosse police department a reasonable and necessary law enforcement objective?**

**Finding: No.**

Wisconsin law enforcement officers are trained when and how to conduct traffic contacts through Wisconsin's unified training on Vehicle Contacts (2014), and Traffic Law Enforcement (2014). Law enforcement officers are trained that:

" *Officers make vehicle contacts for a variety of reasons, not all of them related to traffic. That is why the broader term vehicle contact is more accurate than traffic stop. Some of the reasons you might make a vehicle contact are as follows:*

- *You have reasonable suspicion for a traffic or equipment violation.*

- *You have probable cause to arrest a driver or passenger for a crime.*

- *You have reasonable suspicion that a driver or passenger has committed, is committing, or is about to commit a crime."*

(Pg. 1) (WI Dept. of Justice Vehicle Contacts Manual, 2014).

When conducting any vehicle contact, officers are further trained that their stops must be justified and desirable (WI Dept. of Justice Vehicle Contacts Manual, 2014). In this case, Officer Eddy had personal knowledge that Harris had ordinance citations pending from a completely unrelated matter. Apparently, Officer Eddy's brother, who is also a La Crosse Police Officer, handled the other matter three days ago and could not issue Harris the citations at the time of the incident on the 25th. Officer Eddy decided to issue these citations on behalf of his brother, which could be perceived by the public as a personal vendetta should things turn bad, which they did. A reasonable officer would

not knowingly put themselves in a situation in which there is a perception of personal bias of making an arrest or issuing a citation. Yet, this is exactly what Eddy decided to do.

Officer Eddy took it upon himself to issue the pending citations, which were ordinary tickets and not criminal summons. Officer Eddy described in his report that he staked out Harris' home and auto for several minutes prior to stopping him (Eddy, 2020). Officer Eddy saw that Harris' vehicle was running in front of his residence and waited for Harris to come out, get into the car, and drive off, before making the determination to stop him.

A reasonable officer who is looking to serve citations on behalf of another officer would most likely attempt delivery at the residence if done at all. Upon seeing the person's car running in front of the home would also cause a reasonable officer to presume that the person is inside and about to go somewhere, letting them know they are indeed inside. Officer Eddy said he had knowledge this car was used by Harris and Harris also used this residence. Officer Eddy could have simply walked up and knocked on the door and handed Harris his citations and left. It is also common that citations pending delivery are done via certified mail in law enforcement.

To wait until Harris became mobile in a vehicle is just not good police practice, and questions the legality of the basis for the stop itself. Detentions of citizens are within the realm of the 4th Amendment and based on the need for law enforcement inquiry. The International Association of Chiefs of Police has a model policy on police arrests and stops (2019). The IACP defines the legal authority of police detentions to either

make arrests or investigate persons or situations, otherwise all other contacts are held voluntarily by citizens (International Association of Chiefs of Police, 2019).

This calls into question what was the legal authority, policy, and training guidelines for Eddy to stop Harris to deliver tickets from an event three days old? Harris committed no crime, no traffic violation, and was not wanted. Eddy possessed no probable cause or reasonable suspicion to detain Harris at this point, especially when Eddy presumably had ample opportunity to issue the citations by creating a voluntary contact by knocking on the door of the home he was in. In deposition, the 30b(6) expert for the La Crosse Police Department even testified that the stop of Mr. Harris by Officer Eddy was for the purpose of "delivery of tickets" (Pg. 58) (Daniel Kloss Deposition, 2024).

There was nothing reported by the La Crosse Police Department that would suggest that Harris was a threat, so a reasonable officer's approach to issue these citations would have been a knock on the home's door or through a mailing. Officer Eddy even stated in his report that he watched the running car and home for Harris for "several minutes" (Eddy, 2020), thus admitting there was ample time to take a different approach and brings the necessity of a traffic contact/stop to issue these citations into question. There was also no evidence offered by La Crosse Police Department that other attempts to issue Harris his citations failed or were not feasible.

The use of a traffic contact/stop on Harris in this case is not supported by training, practice, or safety considerations either. There are additional safety concerns when an officer conducts a traffic stop that would not be present if Officer Eddy had simply went to the front door of the home and handed the citations over. Those

concerns are tied to the safety of the officer, person being stopped, and other people/motorists in the vicinity. Traffic stops are inherently dangerous due to the fact that you are stopping someone in traffic and present a physical and visual distraction to other motorist. Every year, officers are hurt and killed on "routine" traffic stops, as are other motorists. In terms of officer safety alone, Eddy's use of a traffic stop to issue a citation seems unreasonable.

I can tell you that in serving for almost two decades in policing, I have never used a tactic of stopping a vehicle for the sole purpose of issuing citations on behalf of another officer or for a previous incident. I have also never seen or heard of it being done by other officers, and this practice is not even trained to Wisconsin law enforcement. My own experience of never being witness or engaged in this type of police detention was also shared by Captain Kloss in his deposition when he testified he was not personally aware of a vehicle contact for the purpose of citation deliveries (Pg. 80/81) (Daniel Kloss Deposition, 2024).

This action by Eddy to wait on Harris to drive seems like a tactic intent on trying to inconvenience/embarrass Harris, or possibly a fishing expedition for other offenses. Either way, this is definitively not something routinely done by law enforcement and would be construed by qualified law enforcement trainers as an unnecessary detention and exercise of police authority that lacks a legitimate law enforcement objective. Traffic stops are a legitimate means for law enforcement officers to stop and detain motorists for traffic offenses or criminal activity, and are not trained to be a mechanism of delivery of non-imminent citations. The reasonableness of this stop deserves to be examined by

a court as Officer Eddy clearly had other mechanisms of delivery of the citation and had no other probable cause to stop the vehicle.

Additionally, Officer Eddy had an obligation to consider the optics of his tactics. Eddy knows Harris is Black, and should have been trained to consider how his discretion of using a traffic stop to deliver these citations could lead to agitation and anxiety by Harris. Wisconsin trains specifically on the topic of bias-based policing and warns officers on how their discretion could have negative effects on the person and community (WI Dept. of Justice Traffic Law Enforcement, 2014). By waiting until Harris went mobile, Eddy must now conduct a traffic stop with a marked police car with its emergency lights activated in Harris' neighborhood. What is less intimidating and embarrassing, having an officer knock on your door and hand you some papers, or being stopped by an officer with several more police cars and officers surrounding your vehicle? A reasonable officer considers their actions and the consequences of them in advance of performing them.

Again, I point to the IACP model policy on police detentions that define them by either arrests or investigations. In this case, there was neither probable cause for an arrest or reasonable suspicion to investigate a violation. Eddy's report even described how he had to "prepare" the citations on his in-squad computer after he stopped Harris. If Eddy went to the home specifically to issue the citations as he stated, the citations should have been prepped in advance, especially when these were from an incident three days ago. This demonstrates a motive by Eddy to create a non-voluntary contact of some kind to initiate police authority or to engage in a contact or detention that was premeditated to be expanded beyond just a simple paper service.

**Issue 2: Was the seizure of Mr. Harris by the La Crosse police department a reasonable and necessary law enforcement objective?**

**Finding: No.**

After the stop was made, Officer Eddy claimed that the detention was escalated due to a smell of marijuana (Eddy, 2020).  Captain Kloss testified that the prolonged detention of Harris was now a seizure (Pg. 61) (Daniel Kloss Deposition, 2024). The Fourth Amendment guarantees that persons are not to be unreasonably searched or seized without a warrant or upon probable cause. In my review of the materials made available to me, I do not see any articulation of probable cause by the officers to seize Harris.

Eddy claimed that Harris only opened his window "a crack" to hear one another as Harris refused to step out of the vehicle. In my experience, officers are trained to be specific as to what they heard, smelled, saw, etc. In my own instruction to officers, including details are key when writing reports, especially when articulating offenses or justifying actions. Officer Eddy said he smelled marijuana, yet offers no other articulation to support marijuana was in the vehicle.

Officers are trained that marijuana odors are distinct and must be supported by how the officer knows that any suspected odor is indeed marijuana. For instance, marijuana odor could be fresh or "green" meaning it's in a plant state. Marijuana that is in a plant state is very distinct from the odor of burning or smoked marijuana. Officers are trained to include these details in their report. A green or fresh odor of marijuana would not necessarily permeate the interior of the vehicle to the extent that Officer Eddy

would be able to smell it from a cracked window unless there was a sizeable quantity inside. Such a quantity would reasonably create a noticeable odor to also be detected by other officers and from other parts of the car to include door seams, trunks, and window seems as these are not air-tight, none of which was reported by the officers.

The smell of burning marijuana would also likely be supported by the visual sign of smoke from inside the vehicle. Officer Eddy writes that he saw Harris exit the home and get into the vehicle, then stops him moments after. At no time did Eddy observe Harris smoking anything, or articulate any flame, light, or evidence that Harris was smoking during his observation. Officers are also trained to report any other signs that a person was recently smoking marijuana in their vehicle such as observable smoke-stained windows, ashes, rolling papers, lighters, glassy or red eyes, or other paraphernalia or physical characteristics.

There are also a host of other types of tobacco, vape products, and incense that have the odor of both fresh or burning marijuana these days that are not illegal to possess or use. Simple saying that you "smelled marijuana" does not articulate anything unless you can describe and justify the odor based on your own training and experience as well as ruling out other products. Officer Eddy failed to do this. Captain Kloss also supports this when he testified there are other things that smell like marijuana (Pg. 51) (Daniel Kloss Deposition, 2024).

The only reason given by Eddy to extend the detention of Mr. Harris is that he claimed he smelled marijuana, which I pointed out is incredibly vague and suspect. No marijuana was ever found in the vehicle, and Harris was not subjected to field sobriety tests or chemical tests to determine if he was operating under the influence of

marijuana. Officer Eddy justifies the continued detention and subsequent force based on this "strong smell of marijuana" , even threatening to smash the car windows to gain entry, but does nothing to follow up on it after Harris was in custody. Officer Eddy at one points tells Harris that he would most likely be issued a ticket if he is found in possession of marijuana. Even anticipating that the origination of the odor would only be another ticket, Eddy still makes threats to shatter the window. I do not know of any agency that would condone using such force and create that much risk of injury and damage for the issuance of a citation.

Sgt. Teff is observed and heard on his body cam making flippant remarks to Harris to exit the vehicle or his windows would be shattered, even saying, "it's gonna happen" (Teff Body Cam Video). These officers appear to be taking liberty with *State v. Frederick* (2018), which authorized law enforcement to have face to face contact with a driver who was suspected of being under the influence of alcohol. I noted that as Teff got on scene, he was briefed by Officer Eddy and asked Eddy if he suspected impairment to which Officer Eddy said he didn't at this point. Sgt. Teff also offered no statement or report himself to substantiate any concern that Harris was impaired. I also observed that none of the officers seemed to have any difficulty hearing and communicating with Harris during the time he remained in his vehicle.

If there was such a concern of an odor of marijuana coming from inside the vehicle, to the point that the officers were willing to risk breaking a window, a reasonable officer would have conducted proper roadside sobriety testing and possibly requested a chemical test to determine a level of impairment. None of that was done by Officer Eddy and combined with the vagueness of the reported "odor", lends itself to

question the allegation of the presence of marijuana at all and the use of a threat to damage property and risk injury in order to force Harris from his vehicle. In both *Frederick* and in *Pennsylvania v. Mimms* (1977) (Pennsylvania v. Mimms, 1977), both cases stemmed from traffic stops that were based on reasonable suspicion of ongoing violations. In the stop of Harris, Eddy did not justify there was reasonable suspicion or probable cause to stop him for a traffic violation to begin with. There was no signs or suspicions of impairment, so the legitimate lawful objective of the police is lacking any necessity to use force to gain access to Mr. Harris.

**Issue 3: Was the use of force on Mr. Harris by the La Crosse police department a reasonable and necessary law enforcement objective?**

**Finding: No.**

Using the body cam videos supplied during discovery by the La Crosse Police Department, I was able to watch and listen to the interaction between Harris and the officers, specifically during the physical use of force used against Harris. I was also provided a video file by the plaintiff's attorneys of a synchronized video from all three body cameras that was reduced to half-speed.

During this traffic stop, Harris' girlfriend arrives and provides the officers with Demond Harris' driver's license and proof of insurance on behalf of Mr. Harris. According to Eddy's report, the citations that needed to be served have been prepared, and he now has a driver's license to eliminate any doubt of identity, and proof of insurance in compliance with state law. The police have all they need to end this contact and allow Mr. Harris to be released at this point, but they don't. Instead, Officer Eddy

presents and readies his baton to shatter the window of Mr. Harris's car unless he exits from it. Officer Eddy even tells the girlfriend that he is "required to have face to face contact" with Harris or else he can break the window (11:27) (Teff Body Cam Video). I am not familiar with any policy or training directive that permits this for a minor citation issuance.

Use of force is guided in the United States by the landmark case, *Graham v. Connor* (1989). The *Graham* case is also the basis for Wisconsin's use of force training, policies, and procedures as determined by the Wisconsin Department of Justice (DAAT Manual Wisconsin Training and Standards, 2017). *Graham* is also embedded in the La Crosse Police Department's policies on use of force (La Crosse Police Department, 2020). *Graham* defines that force must be objectively reasonable based on the following:

1. The severity of the alleged crime.

2. Imminent threats.

3. Active resistance or flight.

We can boil down this incident to an officer wanting to deliver city ordinance tickets from an event three days ago in which we now have an officer ready to smash windows out of a car for. The severity of crime in this case is a minor ticket, otherwise there is no other articulated crime occurring. The "odor of marijuana" is not reliable based on the vagueness of the officer's report, the failure to act on this suspicion, and the lack of reporting by other officers to substantiate it. There is no articulated threat by Harris, and the only resistance he is offering is refusing to get out of his car and speaking through a window opened a crack.

Officer Eddy had an option at this point. He had the tickets printed and he had Harris's license and insurance. All he had to do was slip the documents and citations into the cracked window, or he could have even put them under the wiper blade and walked away. Instead, Officer Eddy opted to escalate his force to the second to last tactic next to deadly force by threatening the use of his baton in this case. The use of the baton could have created serious injury to Harris by shattering glass, or debris, or even being struck with the baton himself.

Seeing that his front passenger window was about to be shattered by Officer Eddy, Mr. Harris exited his car from his driver's side door and was immediately approached and grabbed by Officer Clason. Mr. Harris was using his cell phone to record the actions of the officers and had both hands up in a surrender position. Harris made several statements that he didn't do anything wrong. He was asked to step over behind his car onto the curb by Clason and he immediately complied. Officer Clason tells him that all they wanted was for him to get out of the car.

Harris was then approached by Officer Eddy and Sgt. Teff. Harris can be seen standing on the sidewalk as he was asked to do, and looking and calling out for his girlfriend. One of the officers tells him, "You're not going anywhere", to which Harris says, "I am not leaving".

Harris continued to keep his arms up in a surrender pose and say he didn't do anything wrong. I noted that Harris was complying with the officer's commands to verbally control him. Captain Kloss even testified that at this point in the video, Mr. Harris was cooperative (Pg. 54) (Daniel Kloss Deposition, 2024) However, Officer Eddy and Sgt. Teff moved in and grabbed Harris' arms without justification, in effect creating

a physical seizure of Harris without cause. Officer Eddy grabbed Harris' cell phone and peeled it away from Harris, which is another form of seizure without cause. Harris told them they couldn't do that and the officers started to tell him to put his hands behind his back. The officers never told Harris he was under arrest and Harris was observably cooperative at this time.

Wisconsin has a use of force continuum known as the Disturbance Resolution Model (DAAT Manual Wisconsin Training and Standards, 2017). The City of La Crosse Police Department has also adopted the Disturbance Resolution Model into their policies as a guide and directive on use of force by their officers (La Crosse Police Department, 2020). This model describes subject actions as well as possible officer tactics and response to guide and justify an officer's use of force. For each level of resistance, officers are guided with a tactical response and force options. The lowest level of force is presence, which aims to control people through a visible display of authority. The next level of force is dialog, which is to verbally persuade. If these two levels of control are working, there is no need for an officer to go "hands on" with a person or to escalate to any other force option.

At the time Eddy and Teff moved in and grabbed Eddy and took his phone, Harris was not offering resistance and demonstrated previous immediate compliance to their verbal directions to control his movement and location. In essence, presence and dialog were working just fine for the officers. However, these officers escalated their force anyway and moved into physically manipulating Harris and seizing his phone from him without cause. This would be in violation of La Crosse Police Department's General Order 1.2 that states, "Officers shall use only that amount of force reasonably necessary

to control a situation" (La Crosse Police Department, 2020). Kloss's testimony, as the La Crosse 30b(6) expert, described what he saw on video as Mr. Harris being "almost in a defensive posture" (Pg. 88) (Daniel Kloss Deposition, 2024). I am not aware of any use of force or law enforcement training manual that uses the term "almost" to define a person's actions or behaviors to justify the necessity of police force against a human being. Kloss's testimony to this is laughable, as Kloss clearly cannot admit his officers escalated to physical force on a cooperative person.

As Eddy and Teff grabbed at Harris's arms, Harris turned from them and continued to state he didn't do anything wrong. Harris is physically moved and placed up against a patrol car by the officers. At one point Harris tells the officers they were harassing him. A struggle ensues in which the three officers begin to decentralize Harris onto the ground and ultimately Harris is tasered. There is no justification to do this, and there is no cause for an arrest at this point. Eddy's report states that Harris is offering resistive tension in his arms and trying to pull away from them. However, he does not justify the reason why he had to go hands on to begin with and at no time before or during the physical force and tasing did any officer tell Harris he was under arrest. This is also a violation of La Crosse Police Department's General Order 13.1 that states, "Personnel shall not engage in any unjustified altercation, physical or otherwise" (La Crosse Police Department, 2020).

Resistive tension alone is a form of passive resistance in Wisconsin's use of force training as well as national standards on law enforcement training and practice (DAAT Manual Wisconsin Training and Standards, 2017) (International Association of Chiefs of Police, 2019). Resistive tension is also trained to officers that it does not always indicate

physical resistance or harm, as that is active resistance. Even La Crosse Police Department's 30b(6) expert, Captain Kloss, testified to the difference in resistive tension and active resistance (86-88) (Daniel Kloss Deposition, 2024). A person who was stopped by the police, threatened to have their windows shattered out by a baton-wielding officer, and then is grabbed by these officers after following their verbal orders would reasonably be exhibiting resistive tension in their body at this point.

If Officer Eddy wanted Harris out of the car so bad to check for marijuana, he got what he wanted by physically threatening to shatter the window. Harris then exits, does what he is told and goes where he is told, but that isn't good enough for Eddy who escalates his actions by going hands-on with Harris and takes his phone away. This is not proper police procedure and there is no stated lawful objective to seize Harris' phone or treat him in such a manner. There is no reason for an officer to go hands-on with someone who is following orders and is not posing a threat. The proper police procedure would be to have one officer speak with Harris on the sidewalk while another investigates the alleged odor of marijuana. Yet the videos shows all three officers moving towards Harris in an attempt to use physical force on him.

During this use of force incident, Harris is decentralized to the ground and even tasered. In Wisconsin, the use of a taser is for active resistance or its threats. Active resistance is two-fold as it requires that the subject physically counteract an officer's ability to be controlled while presenting a risk of physical harm to one or more officers (DAAT Manual Wisconsin Training and Standards, 2017). Nowhere in Eddy's report does it state that Harris presented a threat of physical harm to the officers. Eddy's report states that Harris had tension in his arms that was perceived to interfere with

handcuffing, but that doesn't rise to active resistance. There is also no justification to even arrest Harris when the officers went hands-on with him. Towards the end of the body cam video, Officer Clason tells Sgt. Teff, "We'll take him for resisting I guess", which demonstrates to me that the reason for the arrest was uncertain if he has to guess as to what the arrest was for (Teff Body Cam Video).

**Issue 4: Was the strip search of Mr. Harris a reasonable and necessary law enforcement objective?**

**Finding: No.**

Reason:

Wisconsin State Statute 968.255 gives the legal authority to conduct a strip search for persons arrested for specific crimes, or when probable cause exists that leads an officer to believe a person is concealing a dangerous weapon or contraband (Wisconsin State Legislature, 1979). Mr. Harris was not arrested for one of the named crimes in this statute, and there was no written articulation by Officer Eddy that Harris was in possession of a dangerous weapon or contraband.

Once Harris arrives at the La Crosse County Jail, Officer Eddy makes a statement to a jail deputy that Harris may have "crotched" something (Eddy Body Cam, 2020). This is not supported by any other statement, action, or report filed by Officer Eddy. In fact, Officer Eddy's incident report, which is supposed to be a true and factual account of the incident, makes no mention of concern that Harris had indeed crotched or concealed anything. I would expect that since Eddy's entire contact with Harris was also captured on video, Eddy would be heard verbally asking Harris what he "crotched"

23

if Eddy did see him make such a motion. There is zero evidence on video, by the assisting officers, or in any police report that Eddy saw Harris crotch anything or make any furtive movement.

Eddy's actions of informing jail staff that he believes Harris has crotched drugs is going to reasonably trigger more intrusive search actions by the jail staff. I would opine by my own training and experience; this would also include a strip search. After Eddy told a jail deputy that Harris crotched something, the jail staff is seen doing a hand search and a body scan device (Eddy Body Cam, 2020). Harris has now been searched three times; at the scene of his arrest by La Crosse Officers, in the jail by La Crosse deputies, and using a body scanner device by the La Crosse deputies. All three searches failed to result in finding anything, but the jail staff acts on Eddy's words and moves to do a strip search.

Garrison Dichraff was deposed as the 30b(6) expert for the La Crosse County Sheriff's Office and specifically as its jail expert. Dichraff, acting as the La Crosse County expert, made several statements that contradict state law on strip searches and demonstrated his incompetency of knowing strip search procedures. First, Dichraff said that probable cause is not the legal standard to conduct strip searches in Wisconsin, but reasonable suspicion is (Pg. 12) (Garrison Dichraff Deposition, 2024). Wisconsin law requires probable cause to conduct a strip search under 968.255(1)a(4) (Wisconsin State Legislature, 1979).

Dichraff stated that Harris was not subjected to a strip search even though his staff forcibly removed Harris' underwear to reveal his genital and buttocks area (Pg. 15) (Garrison Dichraff Deposition, 2024). A strip search is defined by Wisconsin law as any

area of genitalia or buttocks of a male that is uncovered and observed for view or touched under 968.255(1) (b) (Wisconsin State Legislature, 1979). A strip search is widely known and considered to be any law enforcement/governmental search or intentional observation of a private region of a person (International Association of Chiefs of Police, 2019).

Dichraff also states that his staff did not need supervisory approval to conduct a search of this manner and did not obtain permission to do so (Pg. 13) (Garrison Dichraff Deposition, 2024). Guidelines for permission and documentation of strip searches is specifically defined under Wisconsin statute 968.255 (2) (Wisconsin State Legislature, 1979). If Dichraff, a sergeant at the La Crosse County jail, was put forth as the agency's expert and could not testify to the basic legal requirements of strip searches in Wisconsin, I would have serious concerns the agency is demonstrating deliberate indifference as to its use of strip searches on inmates and detainees.

A reasonable jail staff would ask the arresting officer for more information as to why they believe the person is still concealing something to support their probable cause statement, which was never done. Furthermore, I observed that Mr. Harris was wearing very loose-fitting clothing, what looks to be sweat pants. The clothing worn by Mr. Harris, along with the physical actions of being decentralized and tasered, would have reasonably jarred anything loose if placed in his underwear. If not jarred completely loose, I would expect a competent hand search and body scan would have revealed it to the officers, negating a need of a highly intrusive strip search.

Dichraff admitted in deposition that the scanned image of Harris was inconclusive and could have been something inside his body (Garrison Dichraff Deposition, 2024).

Dichraff also admitted that if a foreign substance was inside Harris, the proper procedure would be to take Harris to a hospital, which was not done (Pg. 32) (Garrison Dichraff Deposition, 2024).

All Wisconsin law enforcement officers and jailers are trained as to the legal necessity of performing a strip search. This is accomplished in several ways. First, Wisconsin requires every agency must have a policy on when officers can strip search someone. The La Crosse Police Department's policy on strip searches is even more restrictive than state law guidance (La Crosse Police Policy 26.2 Strip Searches, 2012) and requires that an officer get written permission from the Chief of Police and file a distinct report to the need and process of the strip search (La Crosse Police Policy 26.2 Strip Searches, 2012).

Additionally, all law enforcement officers are trained on the legal and procedural requirements to perform strip searches through basic and ongoing training offered by the Wisconsin Department of Justice. Officers are trained on the requirements to do a strip search in their Agency Policy training (WI Dept. of Justice Agency Policy Training Manual, 2017), Constitutional Law training (WI Dept. of Justice Constitutional Law Student Text, 2016), Defensive and Arrest Tactics training (DAAT Manual Wisconsin Training and Standards, 2017), and in the Criminal Law Handbook, which is the "Bible" of criminal law guidance to Wisconsin's law enforcement (Wisconsin Attorney General's Office, 2017). The emphasis of protecting a person's rights and dignity from a strip search is so valued in Wisconsin that it is repeated four times in various training topics and a state statute requires an agency policy on it. The legal and procedural requirements for strip searches is also repeated in multiple topics in the jail training

curriculum to include the "Admit and Release Inmates" training (WI Dept. of Justice Admit and Release Inmates Curriculum, 2020)

Eddy may argue that Harris was no longer in his custody and the strip search was authorized by the jail staff. However, Eddy was a law enforcement officer who was bringing his prisoner to the jail. Harris was still being processed into the jail and at the time of the strip search, Harris was still in contemporaneous custody of both Eddy and La Crosse County. It wasn't as if Harris was completely received by the jail and Eddy left the jail and the strip search was done by the jailers without his knowledge. Arguably the strip search was predominantly being performed based on Eddy's statement to one of the jailers, especially considering the jail staff had already performed a hand search and body scan on Harris and did not articulate any need to do the search based on their own quantum of evidence.

I opine that Eddy seemingly expected that his statement to jail staff that Harris was "crotching" something would result in a strip search, especially if Eddy's familiarity with the jail's lax justification on strip searches was a routine event. Eddy was even present as the deputies forced the removal of Harris' underwear to observe his buttocks and pubic area. Eddy would have been trained to know that what he was implying to jail staff, and his presence of allowing it to happen based on his statement, would result in a violation of Harris' rights and be humiliating and degrading in nature. The fact that Eddy did not even mention the strip search in his incident report could be construed as an attempt to conceal the search or his participation in it.

The original basis for Eddy's contact with Harris was a traffic violation.  In *Masters v. Crouch* (1989), the court ruled: "A[t]he decisions of all the federal courts of

27

appeals that have considered the issue reached the same conclusions: a strip search of a person arrested for a traffic violation or other minor offense not normally associated with violence and concerning whom there is no individualized reasonable suspicion that the arrestee is carrying or concealing a weapon or other contraband is unreasonable" (Masters v. Crouch, 1989). As to Eddy's persuasion to initiate a strip search at the jail for "crotching" drugs, *Doe v. Burnham* (1993) states that mere suspicion of having drugs is not enough to perform a strip search (Doe v. Burnham, 1993).

Kloss testified that the officers of the La Crosse Police Department need to obtain a warrant for a strip search (Pg. 32) and that the smell of marijuana alone would not be sufficient to seek a warrant for a strip search (Pg. 33) (Daniel Kloss Deposition, 2024). Kloss even admitted that there is no report by Eddy or other officers that Harris crotched something (Pg. 33) (Daniel Kloss Deposition, 2024) In Kloss' words, members of his agency, "would not do that" in terms of seeking to have a person stripped search for the odor of marijuana alone (Pg. 33) (Daniel Kloss Deposition, 2024). Kloss said that he expects his officers to abide by proper procedures, and to document observations and act on them (Pg. 43/44) (Daniel Kloss Deposition, 2024). Kloss even testified that anyone who intentionally violated another person's rights would not be someone the La Crosse Police Department would want to employ (Pg. 60/61) (Daniel Kloss Deposition, 2024).

As Kloss seemingly tried to justify Eddy's actions and his agency's expectations in a morale framework, he deflected the questions raised in deposition about Harris' treatment and strip search to the La Crosse County Sheriff's Office. In doing so, Kloss ignored the morale and legal consideration that Officer Eddy's actions encouraged and

allowed a strip search for no lawful purpose in his presence. Kloss offered testimony that since the search was done by the La Crosse County jail staff, even in Eddy's presence and based by Eddy's statement to them, that the strip search was not the La Crosse Police Department's responsibility. I find this to be an incredulous admission by the La Crosse Police Department's expert that his officers have no obligation to stop an intrusion of a person's most sacred privacy or stop a potential violation of a person's rights in their presence. Kloss offered further testimony that his officers would only assist the jail staff in searching people if it was for the safety of the law enforcement officers (Pg. 39) (Daniel Kloss Deposition, 2024), but offered no testimony that he expects his officers to intervene when the safety or rights of the accused are in jeopardy by the jail staff. This may demonstrate a culture of deliberate indifference to the treatment and rights of a human being held in custody by the La Crosse Police Department.

### _Conclusion_

I base my opinions after review of the materials provided to me and supported by my experience, education, and training to a reasonable degree of professional certainty. I reserve the right to alter or supplement my opinion and report should more information be made available to me.

Report By:

Brian L. Landers

## Materials Cited

Clason Body Cam. (2020, February 28).

Client Description Document. (n.d.).

DAAT Manual Wisconsin Training and Standards. (2017, December). DAAT Student Mmanual. Madison, WI.

Daniel Kloss Deposition. (2024, January 25).

Doe v. Burnham, 6 F.3d 476 (7th Circuit 1993).

Eddy Body Cam. (2020, February 28).

Eddy Squad Camera. (2020, February 28).

Eddy, G. (2020, February 28). Incident Report 20-09144.

Garrison Dichraff Deposition. (2024, January 25).

Graham v. Connor, 490 US 386 (U.S. Supreme 1989).

International Association of Chiefs of Police. (2019). Arrests and Investigatory Stops.

International Association of Chiefs of Police. (2019). Strip and Body Cavity Searches.

La Crosse County. (2020). Criminal Complaint.

La Crosse County Jail Reports. (2020). Harris Arrest Records and Body Scan Images.

La Crosse Police Department. (2020). Policies and Practices in 21st Century Policing.

La Crosse Police Department Annual Report 2020. (2020).

La Crosse Police Policy 26.2 Strip Searches. (2012).

La Crosse Police Taser Reports. (2023, July 28).

Masters v. Crouch, 872 F.2d 1248, 1255 (6th Circuit 1989).

Pennsylvania v. Mimms, 434 US 106 (US Supreme 1977).

State v. Frederick, 2018 WI 2 (Wisconsin Supreme 2018).

Synched Video File MP4. (2024).

Teff Body Cam Video. (n.d.).

United States Census Agency. (2020). Census Data.

WI Dept. of Justice Admit and Release Inmates Curriculum. (2020). Student Text.

WI Dept. of Justice Agency Policy Training Manual. (2017). Student Text.

WI Dept. of Justice Constitutional Law Student Text. (2016, December).

WI Dept. of Justice Traffic Law Enforcement. (2014).

WI Dept. of Justice Vehicle Contacts Manual. (2014). *Vehicle Contacts- A Training Guide for Law Enforcement*.

Wisconsin Attorney General's Office. (2017). Criminal Law Handbook.

Wisconsin State Legislature. (1979). Strip Searches.

**CURRICULUM DEVELOPMENT ADDENDUM**

- Building A Course Roadmap- Madison College (2021)
- Childcare Center Workplace Violence for Administrators- Madison College (2018, 2019)
- Childcare Center Workplace Violence for Employees Training- Madison College (2018)
- Choosing the Appropriate Tool from the Instructor Toolbox- Madison College (2021)
- Civilian Conceal Carry Training Manual- WI DOJ. (2010)
- Conceal Carry Considerations for Law Enforcement- Madison College (2012-Present)
- Creating and Assessing Measurable Outcomes- Madison College (2021)
- Criminal Investigations Theory (Degree Credit)- Madison College (2018)
- Criminology (Degree Credit)- Madison College (2019)
- Critical Incident Training for Hospitality Leaders- Madison College (2018, 2019)
- Defensive and Arrest Tactics Course for Law Enforcement- Wisconsin Dept. of Justice. (2204, 2008, 2012)
- Dells Area Response Emergency Exercise (2020)- Madison College
- Domestic Violence in the Workplace- Madison College (2020)
- Drone Basics- Madison College (2017)
- Electronic Control Device Manual- WI DOJ  (2004, 2008, 2010)
- Evacuating and Sheltering for the Workplace- Madison College (2020)
- Firearms Training Manual- WI DOJ. (2004, 2008, 2012)
- First Line Police Supervision for Law Enforcement and Correctional Officers- Madison College (2014, 2015, 2018)
- Focus on Quality- Madison College (2021)
- Force Issues for Today's Law Enforcement- Madison College. (2011-Present)
- Force Transition Course for Law Enforcement, Security, and Correctional Officers- Madison College. (2015)

- Formulating Grading Policies to Achieve Learning Outcomes-Madison College (2021)
- Introduction to Corrections (Degree Credit)- Madison College. (2010, 2011, 2012, 2016)
- Introduction to Criminal Justice (Degree Credit)- Madison College. (2010, 2011)
- Juvenile Law (Degree Credit)- Madison College. (2010, 2011, 2018)
- Learning to Take the Learner's Perspective- Madison College (2021)
- Private Sector Security Course (Degree Credit)- Madison College (2018)
- Professional Development for Public Safety (Degree Credit)- Madison College (2017)
- Public Safety Drone Applications- International Law Enforcement Educators & Trainers Association (2015)
- Report Writing (Degree Credit)- Madison College (2016)
- Self Defense and Force Issues for Security Personnel- Covance Labs. (2008)
- Self Defense for Campus Security Personnel- Madison College (2010, 2012)
- Small Business Security Practices – Madison College (2019)
- Split Cell Active Shooter Concepts-Madison College. (2011-Present)
- Split Cell Active Shooter Tactics for Law Enforcement- Columbia County (WI) Chiefs Association. (2008, 2009)
- Tactical Response for Law Enforcement- WI DOJ. (2004, 2008, 2012, 2015)
- Taser Civilian User Course- Taser International (2010)
- Threat Assessment for Workforce-Madison College (2020)
- Three Steps To Introduce Your Online Course- Madison College (2021)
- Total School Safety for K-12 Decision Makers- Madison College (2018)
- Traffic Theory (Degree Credit)- Madison College (2016)
- Unmanned Aerial Device for Public Safety Operations- Madison College. (2014-Present)
- Use of Force Investigations for Law Enforcement, Security, and Corrections. (2012- Present)
- Use of Force Investigations for Police Supervisors- Madison College. (2012-Present)

- Workplace Violence Scenario Training- Access Community Health (2017)
- Workplace Violence for Employees and Employers- Madison College (2020)
- Focus on Quality Online Course Building- Madison College (2021)
- Three Steps to Mitigate Civil Exposure in Police Use of Force Incidents- Madison College (2021).
- School Safety and Threat Mitigation- Wingra School. (2022)

**PUBLICATIONS ADDENDUM**

"An Analysis of A Nation-Wide Use of Force De-Escalation Policy And The Impact On Officer Safety." American Public University. (2017)

"Are de-escalation policies dangerous?"- *Police Magazine*. October 2017.

"De-bunking de-escalation*"- Law and Order Magazine*. Hendon Publishing, August 2017.

"Put Statistics to Work"- *Law and Order Magazine*. Hendon Publishing, October 2016.

"The Facts of Officer-Involved Shootings"- *Law and Order Magazine*. Hendon Publishing May, 2015.

"Lobby for Your Protection Before A Major Incident" *Officer Magazine*. Endeavor Business Media, February, 2023.

"Focus on Transition With De-Escalation Training"- *Officer Magazine*. Endeavor Business Media, March, 2023.

"Safeguarding Your Family When Accusation Occur"- *Officer Magazine*. Endeavor Business Media, May, 2023.

"Remember the Lessons Your Mom Taught You"- *Officer Magazine*. Endeavor Business Media, August, 2023.

**AFFILIAITIONS ADDENDUM**

Association of American Educators

American Psychological Association

American Society of Evidence-Based Policing

Forensics Expert Group-Registrant

Fraternal Order of Police

Global Institute for Forensic Research

International Law Enforcement Educators and Trainers Association

International Association of Chiefs of Police

International Association of Correctional and Forensic Psychology

National Sheriff's Association

Police Forensic Psychology Association

TASA Expert Witness Registry

Thomson Reuters Professional Witness Registry

Wisconsin Law Enforcement Training Officers Association

Wisconsin Musky Alliance

Wisconsin Psychology Association

**EXPERT EXPERIENCE ADDENDUM**

Michael B. Kingsley v. Stan Hendrickson, et al., Case No. 12-3639
I testified as an expert witness for the plaintiff, Michael Kingsley, in US District Court (Western Wisconsin) in a case related to the use of force on Mr. Kingsley.

State of Wisconsin v. Charles J. Fabry. Case: 2013CF000609
I was retained as an expert witness in Wisconsin Circuit Court (Brown County) for the use of force on Charles Fabry. The case settled.

State of Wisconsin v. Jeremy J. Imhoff. Case: 2014CM000026, 2015CF000096
I was retained by the Dane County District Attorney's Office as an expert witness in use of force for the prosecution of Mr. Imhoff. The case was settled just prior to trial.

Michael B. Kingsley v. Stan Hendrickson et al., Case No 3:10-cv-00832
I testified as an expert for the plaintiff, Michael Kingsley, in US District Court (Western Wisconsin) in a case related to the use of force and Taser use on Mr. Kingsley. The original trial was successfully appealed by the plaintiff to the United States Supreme Court and was remanded down back to the original court of jurisdiction.

Katie Austin v. United States of America et al., Case No 15-CV-1207.
I was the defense expert hired by Coyne, Schultz, Becker, and Bauer, in the US District Court (Eastern Wisconsin) in a case related to the use of force by contracted security officers on Ms. Katie Austin. I testified in deposition on May 3, 2017. The matter was dismissed in summary judgement.

Estate of Christopher Davis v. Juan Ortiz, Walworth County (WI), et al. AI2:18-CV-01846. I was retained by Cade Law Group as the plaintiff's expert in a case involving a passenger in a vehicle that was shot and killed by a deputy during a drug investigation. I testified in deposition on July 26, 2019.

Jimmy L. Harris v. City of Milwaukee (WI), et al. 14CV1002. I was retained by Cade Law Group as the plaintiff's expert in the US District Court (Eastern Wisconsin) involving the improper stop, detention, frisk, and use of force on a motorist in the City of Milwaukee. I testified in the jury trial in March, 2020. The jury found in favor of the plaintiff and awarded over $2 million.

Estate of Marco Gomez v. Village of Forest Park (IL) & Daniel Miller, 18C910. I am retained as the plaintiff's expert by Action Injury Law in a case pending in US District Court (Northern Illinois). The case involves the shooting death of a suspect in a stolen vehicle. I testified in deposition on August, 2020 and February, 2021.

Akil Carter v. City of Wauwatosa (WI), 19-CV-1422. I am retained by Bertrand Law on behalf of the plaintiff in US District Court (Eastern Wisconsin)  regarding the detention and force used on a passenger in a motor vehicle. I testified in deposition for this case in July 2022.

Stephen Mark Davidson et al vs. Floyd County, Iowa et al., Case: 6:20-CV-2019. United States District Court (Eastern Iowa). I was retained as an expert in this case regarding the police practices of a drug-related search warrant to the home and body of Mr. Davidson. I testified in deposition on 09/28/20.

Jacob Blake v. Sheskey (WI) 2021-CV-00038. I was retained as the plaintiff's expert in 2020 by the law firm Salvi, Schostok, and Pritchard regarding the officer-involved shooting of Jacob Blake in Kenosha, Wisconsin.

The Estate of Isiah Lewis vs. Edmond (OK) Police Department. I was retained in 2020 by attorney Action Injury Law, in the pending civil suit in US District Court (Northern Oklahoma) regarding the officer-involved shooting of Isiah Lewis by Edmond, Oklahoma law enforcement officers. My review found that the officers were justified in using deadly force.

White v. Kansas City (MO). Case 4:21-cv-00404 I am retained by Hubbard & Kurtz, who are representing the plaintiff, in a case involving the accidental shooting of a homeless man by the Kansas City Police Department.

The Estate of Marc Nevarez vs. City of Chicago (IL). I was retained by Thedford Law Group in 2021 to review the shooting death of Marc Nevarez by a City of Chicago Police Officer, for the potential of a civil rights violation suit. My review found the officer was justified in using deadly force.

Jason Pero vs. Ashland County (WI) and Brock Mrdjenovich,  20 CV 984. United States District Court (Western District of Wisconsin). I was retained by Axley Brynelson Law in 2021 on behalf of the defense in the matter of an officer-involved shooting death of Jason Pero by Deputy Mrdjenovich of Ashland County, WI. I prepared an expert report for the defense and the case was dismissed in summary judgement in December 2021.

Estate of Daunte Wright v. Brooklyn Center (MN). I am retained by the plaintiff's attorney, Romanucci and Blandin, in a case involving a motorist shot and killed by a law enforcement officer who mistook her handgun for a taser. Case is pending.

The Estate of Shannon Payne vs. Dane County Sheriff's Office (WI), 20CV-0512. United States District Court (Western District of Wisconsin). I was retained in 2021 by Cade Law Group on behalf of the plaintiff who died in custody at the Dane County (WI) jail. Case is pending.

Lucas Williams vs. City of Fort Wayne (IN). I am retained as the plaintiff's expert by Geisleman & Brown, in a case regarding the use of crowd control tactics during a civil rights protest. I testified in deposition 04/05/23.

Denzel Taylor vs. City of Sikeston (MO). I am retained as the plaintiff's expert, Donlan-Brand, in a case regarding the use of deadly force on Denzel Taylor. I testified in deposition 06/28/23.

Kurtz v. Steven Kunnath, et al Case No. CV-20-138 (MT). I am retained as the plaintiff's expert by Jami Rebsom Law regarding the use of physical force by the police on Mr. Kurtz in Livingston, MT. Expert report filed in January 2022 and defendants settled with plaintiffs in May, 2022.

Sikon v. Carroll County (OH). 20-CV-674. I am retained as the plaintiff's expert by Spangenberg, Shibley, and Liber in the shooting death of a suspect who attempted to flee arrest. I testified in deposition December, 2022.

Kramer v. Dekalb (IL). I am retained as the plaintiff's expert, Duncan Law Group, to review the case of a mentally impaired man who was  wielding a sword and was shot and killed by law enforcement. Case is pending.

Bernard Kersh v. City of Chicago 20-L-001518. I am retained by the plaintiff's attorney, Hart, McLaughlin, and Eldridge, involving the use of physical force on Bernard Kersh by Chicago Police Department. I testified in deposition November, 2022, and the City of Chicago settled with the plaintiff in June, 2023.

Joseph Walker v. City of Milwaukee et al. 20-CV-0487. I am retained by the plaintiff's attorney, OVB Law, involving the use of deadly force on an alleged unarmed citizen by Milwaukee Police officers. I testified in deposition on 09/29/23 and trial on 11/30/23. The jury found in favor of the plaintiff in the amount of $2 million.

Espino v. Mistretta. I am retained by Conybeare Law Office to review the arrest tactics of a Hartford (MI) police officer upon Mr. Espino. Case is pending.

State v. Flannery (WI). I was retained by Kuchler & Cotton to review officer's use of force and tasing of Dennis Flannery in the State of Wisconsin. My review offered an opinion the officers were justified in their force actions.

Cheyenne Finley v. William White, et al (IL). I am retained by Schultz and Myers to review a case regarding a juvenile injured by a police officer during a school bomb threat. Case is pending.

Lawrence Montoya v. City of Denver (CO). 16cv1457. I am retained by the law firm of Fisher and Brialysen to opine on police procedures when writing affidavits. I testified in deposition 06/09/23.

Cordova v. Alberquerque (NM). 14-2083. I am retained by the law offices of Ryan Villa to opine on police tactics in an officer-involved shooting.

Erik Lopez v. Las Cruces (NM) Police. I was retained by the law offices of Ryan Villa to review the K-9 deployment on Erik Lopez. My review found the officers were justified in their actions.

Jesus Lopez v. Albuquerque (NM) Police. I was retained by the law offices of Ryan Villa to review the officer-involved shooting death of Jesus Lopez. My review found the officers were justified in their actions.

Estate of Ryan Mitchell v. City of Waupun  Police Department (WI) 21-CV-322. I am retained by the law firm, Von Briesen & Roper, on behalf of the defense to opine on the actions of an officer during a mental health investigation. Case was dismissed in summary judgment.

Woodard v. Schopp, Bahling, et al 22-CV-0005827. I am retained by Cade Law Group to opine on the actions of Wisconsin State Troopers investigating a disabled motorist. Expert report filed January, 2023.

Pierce v. Robbins. I am retained by Conybeare Law Offices to opine on the use of force on an inmate in the Berrian County (MI) Jail. I testified in deposition on December 13, 2023.

Demond Harris v. City of La Crosse (WI) 23-CV-62. I am retained by Davey & Goldman, LLC to opine on the detention and use of force of Mr. Harris.

Kevin Marshall v. City of Lincoln (NE). I am retained by Powers Law, LLC to opine on the crowd control tactics of area law enforcement during a 2020 protest.

Estate of Amy Joy Wakefield v. Southwest Central Dispatch Center (IL). Case 23-143). I am retained by Wise-Morrisey to opine on the dispatching and response procedure of a medical emergency.

Standley v. City of Chicago. I am retained by HME Legal to opine on an officer striking and seriously injuring a pedestrian with a squad car. I testified in deposition on 08/29/23. The matter settled in favor of plaintiff in October, 2023.

Boone v. Ottawa County Dispatch (MI) 1:23-CV-00015. . I am retained by Nolan and Shafer to opine on the dispatching procedures of a domestic-related homicide.

Keyshawn Johnson v. Albuquerque Police (NM). I am retained by Taylor Smith and Associates to review and opine on the shooting death of Mr. Johnson.

The Estates of Brett Rosenau v. Albuquerque Police (NM). I am retained by Taylor Smith and Associates to review and opine on SWAT tactics that led to the inhalation death of a juvenile inside a home that chemical and stun munitions were deployed on.

The State of New Mexico vs. Ryan Downing. I was retained by Mitchell Law Offices, representing the defendant, to review and opine on Downing's use of deadly force during a physical assault. My report led to a dismissal of homicide charges for the defendant.

Michael Lewis et. al. v. City of Rosenberg et. al., 4:22-cv-02593 (TX). I am retained by the National Police Accountability Project to review the police practices involving a high-risk traffic stop and physical detention on a disabled individual.

The Estate of Jordan Pruyn vs. Columbia (MO) Police Department. I was retained by Spangler Ward to review the shooting death of Jordan Pruyn during a tactical stand-off. My review found the officers complied with their training and policy on using deadly force.

Reyes v. Albuquerque Police (NM). Case 10013. I am retained by Ellis and Estes on behalf of the plaintiff to opine on the shooting of an unarmed man during a warrant execution.

Emanual Fair v. Redmond Police, et al (WA). Case 0-207124. I am retained by Galanda Broadman, LLC to opine as to the investigation practices by members of the Redmond Police Department that led to the wrongful conviction of Emanual Fair for a homicide.

Olson-Villanueva vs. Town of Bernalillo (NM). Case 10014. I was retained by Soto Law Offices on behalf of the plaintiff to opine on the police practices of an unlawful arrest and detention for a violation of a restraining order.

Hewitt v.Mountjoy Police et al (PA).  Case 3-23 cv-00064. I am retained by the law firm Alexander Shunnarah, on behalf of the plaintiff to opine on a case involving the detention of a vehicle occupants who were then struck by a passing motorist.

Justin Blake v. City of Kenosha (WI) Case 22-cv-970. I am retained by Motley Law on behalf of the plaintiff to opine on an incident involving the arrest and incarceration of a man engaged in a silent protest.



# Brian L. Landers
# Owner-LandersCRT, LLC
## PO Box 803 Wisconsin Dells, WI 53965

Phone: 608-393-3491                          brian@landerscrt.com

---

## EDUCATION

_Ph.D. studies in Forensic Psychology_- _Walden University (2020-Present)_

_Master's in Public Administration_**-** American Military University (2014-2017)
Graduated with honors. Completed nationally recognized research and thesis on the impact of ministerial de-escalation policies and the impact of officer's injuries and deaths.

_Law Enforcement Executive Director School_- Federal Bureau of Investigations (2010)

_BS- Criminal Justice Administration_- Mount Scenario College. (2000-2002)
Graduated Summa Cum Laude with a major in Criminal Justice and minor in Pre-Law.

_Law Enforcement Academy_- Madison College. (1993).
Completed basic training of state law enforcement academy.

_Associate Degree Studies in Police Science_- Madison College (1989-1992)

_High School Diploma_**-** Wisconsin Dells High School (1989)

## EMPLOYMENT

*LandersCRT, LLC*. (2014- Present)
I am the owner and sole employee of my firm that provides consulting, research, and training on law enforcement and security issues. I specifically provide expert testimony services on police and security practices that includes use of force, training, agency policy, physical security, and general practices.

*Madison College, Madison, Wisconsin* (September 2010- Present, Full-time)
I am a full-time faculty member in the Criminal Justice Division in the School of Human and Protective Services. My current duties include instructing and developing curriculum in the criminal justice program, mentoring faculty and students, and aid in student enrollment and retention. I also serve the School of School of Workplace and Economic Development on developing and instructing workplace violence, active shooter, and organizational security protocols to private businesses. My role with the School of Workplace and Economic Development also provides technical assistance and consulting to organizations and companies that hire the college to perform safety assessments, security and emergency incident reviews, and policy development. In the Spring of 2021, I was assigned to the college's Center of Excellent in Education and Learning to lead a Focus on Quality Initiative to develop and instruct faculty on improving course design and delivery. During my career with Madison College, I served as the Law Enforcement Academy Director, Jail Academy Director, and Coordinator of Law Enforcement Training from 2011 to 2016.

*BlueboardIT, LLC*. (January 2007-2014)
I co-owned a public safety training and consulting company that aids clients with facilitation of a variety of advisory and training needs. My duties were to help clients develop internal training programs to include those on use of force, tactics, policy, security training, and legal training. I would occasionally provide administrative consultation on use of force tactics and training audits. I sold my interest in the company in 2014 to launch LandersCRT.

*Wisconsin Dells Police Department*. (1992- 2011)
My duties included a combination of patrol and investigations during my overall career.I served as K-9 Handler from 1995-2003, was promoted to Sergeant from 2003-2008, and appointed to Lieutenant from 2008 through the end of 2010. I handled a wide variety of investigations to include traffic incidents, property crimes, personal crimes, sexual assaults, crimes against juveniles, and death investigations. As a supervisor, I was responsible for patrol personnel, oversight of the drug unit, tactical team, investigations, and agency training. I retired from the agency in excellent standing in 2010 to accept a full-time position with Madison College.

_Madison College, Madison, Wisconsin_ (2002-2010)
I was employed as a part-time faculty member for eight years, teaching criminal justice and law enforcement training. My primary responsibilities were instruction to police academy recruits in a variety of investigatory and patrol-related topics to include use of force training, defensive tactics, firearms, traffic enforcement, evidence, investigations, interviewing and interrogations, and victims of crimes.

_Crystal Grand Music Theater, Wisconsin Dells_ (2000-2008)
I was employed part-time in performer protection for a music theater that specialized in country and rock music acts. From 2002-2008, I served as the director of security and was responsible for all security personnel and operations for the performances. This was a primarily a weekend "fun" job that married my skills in law enforcement and my love for music. I resigned in excellent standing when my schedule no longer allowed me the time to commit.

_South Central Security, Wisconsin Dells._ (1991-1992)
I worked part-time through college as a uniformed security officer for a small security company. My main area of patrol included a large waterpark resort on the night shift.

## SERVICE AND LEADERSHIP

_Mayor- City of Wisconsin Dells_. (Elected April 2011-April 17, 2018)
The Mayor is an elected position that statutorily directs all operations for the municipal government. I was elected to my first term in April 2011, my second term in 2013, and my final term in 2015. I opted to not run for re-election in 2018. As Mayor, I helped manage over 100 city employees and volunteers, set general policy and direction of the city, work with other governments and private industries on varying issues, and correspond with citizens and businesses on a daily basis. Procedurally, I chaired the common council, personnel committee, plan commission, and Dells-Delton EMS commissions which requires a strong knowledge of rules and laws related to the public's trust and transparency of local government. I possessed oversight of the city budget, and set general policies and direction throughout the year. Our city's overall budget is approximately $12 million annually with bond and debt budgets of over $34 million.

_State of Wisconsin Special Legislative Committee on 911_. (2012)
Appointed to serve by State Representative Ballweg and Senator Jauch. As a committee member, I provided direction and development to help draft new legislation on the operations and training of local 911 systems. I was requested to serve the Legislature in this capacity due to my strong knowledge of

emergency services as well as my leadership role as a former county board member, and present mayor of one of the top tourist destinations in the Midwest.

_Columbia County Board of Supervisors_. (2006-2011)
Elected 2006, re-elected 2008, & 2010. Helped determine policy issues, general direction of county government, personnel issues, and management of a $72 million annual budget. Upon initial election, I was assigned to the Solid Waste and Management Information Services Committees. In my second term and third term, I was elected by my peers to chair the Management Information Services Committee in which I worked directly with the department's staff, helped guide special projects, and influenced policy and operations the MIS department. I also served as a member of the Human Resources Committee in my second and third term as well. The HR Committee was responsible for all wages, benefits, grievances, contracts, and policies for all county employees. I was involved in contract negotiations and arbitrations, researched benefit and safety policies, & completed wage analysis for union and non-union employees throughout my service.

_Wisconsin Dells Visitors & Convention Bureau Board of Directors_. Elected 2011-Present.
I was elected to fill a vacant seat on the WDVCB Board. My duties on the BOD include helping set marketing strategies and operational guidelines for the primary tourism engine of our community. We manage close to a $10 million marketing and operational budget, analyze visitor data as well as electronic marketing feedback, and provide direction to staff and committees on promotions, festivals, contracts, and planning. The economic impact of our local tourist industry is estimated over $1 billion annually.

_Wisconsin Department of Justice Committee on Active Shooters_. Appointed 2013-present.
Was appointed due to my experience and knowledge of active shooter events, presentations on school and organization safety, and my ongoing instruction to law enforcement officers on proper tactics in response to serious threats and active shooters.

_Wisconsin Department of Justice Ethics Committee_. Appointed 2000-2003.
Developed statewide curriculum and training on police ethics for the Wisconsin Department of Justice Training and Standards Bureau. I was the only non-administrative appointee at the time and the youngest appointee to the committee. Resigned from appointment in 2003 to be appointed to Tactical Advisory Committee.

_Wisconsin Department of Justice Tactical Committee_. Appointed 2003-2014.
Develop curriculum and training for police agencies and academies in Wisconsin for all use of force and tactical issues. Provide training and consultation on use of force, training, and tactical guidelines to agencies and academies throughout the

state. Resigned from appointment in 2014 due to increased responsibilities with Madison College.

_Columbia County Humane Society Board of Directors_. Elected 2003-2006. I was elected to the board by standing board members in 2003, and nominated/elected as President in 2004, 2005, and 2006. As a member of the Board, I chaired monthly meetings, helped organize funding and events, and managed personnel and budgets for this non-profit organization.

## INSTRUCTOR HISTORY/CERTIFICATIONS

Agency Policy Instructor- WI DOJ.
Civilian Conceal Carry Instructor- State of Wisconsin.
Community Resources Instructor- WI DOJ.
Constitutional Law Instructor- WI DOJ.
Crimes Instructor- WI DOJ.
Crisis Management Instructor- WI DOJ.
Domestic Instructor- WI DOJ.
Field Drug Identification and Testing Instructor- WI DOJ.
Firearms Certifier- Wisconsin Department of Regulation and Licensing.
Firearms Instructor- WI DOJ.
Interview and Interrogation Instructor- WI DOJ.
Juvenile Law Instructor- WI DOJ.
Master Instructor of Defensive Tactics- Wisconsin Department of Justice.
Master Instructor of Scenario-Based Training- Wisconsin DOJ.
Policing Strategies Instructor- WI DOJ.
Professional Orientation Instructor- WI DOJ.
Report Writing Instructor- WI DOJ.
Scene Management Instructor- WI DOJ.
Tactical Response Instructor- WI DOJ.
Taser Instructor- Taser International.
Traffic Crash Investigations Instructor- WI DOJ.
Traffic Laser Instructor- Kustom Radar.
Traffic Law Enforcement Instructor- WI DOJ.
Vehicle Contacts Instructor- WI DOJ.
Wisconsin Technical College Teaching Certification- WTCS.

## ADVANCED AND SPECIALIZED TRAINING

Active Shooter Dynamics- U.S. Dept. of Homeland Security.
Advanced Drug Investigator- Wisconsin DOJ.
ALICE- Basic Response to Active Shooter
Basic Workplace Security Awareness- FEMA
Cyber Security Training- Madison College
De-escalation Techniques- Target Solutions
Definition of Deadly Force-WI DOJ
Diversity and Bias- Madison College
Domestic Abuse Response and Investigations- WI DOJ.
Drug Endangered Children In a Rural Environment- WI DOJ
Drug Interdiction Specialist- NHTSA.
Drug Unit Supervisor- Wisconsin Dept. of Justice
Evidence/Crime Scene Technician- Wisconsin Dept.of Justice
FBI Law Enforcement Executive Development- Federal Bureau of Investigations.
Firearms & Toolmark Identification- National Institute of Justice.
FEMA- ICS 100, 700
FEMA- Workplace Security Certificate
FEMA- Security Surveillance
Field Evidence Technician- Wisconsin DOJ.
Field Training Program Coordinator- MATC- Madison.
Honor Guard Commander School- Wisconsin State Patrol.
Hostage Negotiator- FBI.
Identifying Deceptive Behavior-Washington D.C. Metro Police/ NCTC.
In-Custody Death Investigation- In-Custody Death Institute.
Incident Command- FEMA.
Interview and Interrogation- Madison College
Juvenile Mistreatment and Sexual Assaults- Wisconsin Dept. of Justice
K-9 Criminal Apprehension Training- Sundogs K-9 Training Center.
K-9 Drug Detection- Sundogs K-9 Training Center.
K-9 Search and Evidence Collection- Sundogs K-9 Training Center.
K-9 Unit Administrator- Eden and Nay, International K-9 Conference.
Law Enforcement Officer Killed and Assaulted Training- FBI.
Multi-hazard Planning for Childcare- FEMA
Officer-Involved Shooting Investigations- Broward County Sheriff's Office/ FVTC.
Preparing for Mass Casualty Incidents in Schools- FEMA
Response to Active Shooter- MATC.
Search Warrant Execution- NYPD/ NE Counter-Drug Training Center (NCTC).
Sexual Assault Investigations- Herzig College.
Supervision of Police Personnel- Wisconsin Dept. of Justice
Surveillance Photography- NCTC.
Use of Force Reports and Testimony- Los Angeles County Sheriff's Office.

## KEYNOTE SPEAKER

- Access Community Health Presentation- "Threat Assessment and Response for Employees."
- Adams County Community Presentation- "Active Shooter Preparedness"
- Adams-Friendship School District- "Transportation Employee Threat Response."
- Covance Labs- "Training Technology for Private Security"
- Great Lakes Higher Education- "Corporate Response To Threats and Active Shooters"
- Great Lakes Higher Education- "Fingerprinting Training and Background Checks"
- Infraguard Annual Conference Keynote- "Because There Are Bad People Out There" (What we can learn in ourselves by raising special needs children."
- International J-1 Employer's Conference- "Helping Those In Need."
- Madison College- "Conceal Carry Training"
- Madison College- "Employee Self Defense"
- Madison College- "Woman's Self Defense"
- Midwest Conference of Financial Aid Administrators- "Dangers in Our Schools"
- Midwest Railroad Association- "Challenges Facing Today's Rail Lines"
- NAACP- "The Facts of Force"
- State of Wisconsin Dept. of Regulation & Licensing- "Dangers in the Workplace"
- Wisconsin Dells School District- "Dangers of Active Shooters"
- Wisconsin Home Energy Conference- "Dangers in the Workplace"
- Wisconsin Home Energy Conference- "Personal Safety Initiative and Self-Defense"
- Wisconsin Identification Conference- Presentation on Unmanned Aerial Vehicles.
- Wisconsin Juvenile Justice Conference- "Personal Safety"
- Wisconsin Municipal Courts Conference- "Leadership in City Government"

## MEDIA INTERVIEWS/FEATURES

- Blue Lives Network- Podcast interview on police de-escalation policies.
- Capital Newspapers- Interviewed on drones in public safety.
- Capital Newspapers- Interviewed on police recruitment.
- Capital Newspapers- Interviewed on social pressures against law enforcement.
- My Statesman Newspaper (Austin, TX)- Interviewed on de-escalation policies.
- Police One. Com- Interviewed on use of force de-escalation policies.
- The Clarion Newspaper (Madison, WI)- Interviewed on police and community trust.
- The Clarion Newspaper (Madison, WI)- Interviewed on Tasers on college campuses.
- International Business News- Interview on Taser deployments and use of force.
- WISC TV- Madison- On air interview on police Tasers and police training.
- Wisconsin Public Radio- Guest on traffic safety.
- WISCTV- Madison- Morning show guest to discuss police response to active shooters.
- WISCTV- Madison- On air interview on officer-involved shootings.
- WISCTV- Madison- On air interview on police de-escalation policies.
- WISCTV- Madison- On air interview on police vs. security officer training.
- WISCTV- Madison- On air interview on threats of violence against populated areas.
- WISCTV- Madison- Special segment on police communications with people of special needs.
- WISCTV- Madison-Interviewed on Castle Doctrine.
- WISCTV- On air interview on decline of police applicants.
- WISCTV- On air interview on fugitive manhunt procedures.
- WISCTV- On air interview on mass casualty shootings.
- WISCTV- On air interview on police "de-militarization" concepts.
- WISCTV- On air interview on the credibility of school threats.
- WISCTV-Madison- On air interview on police force reviews and consultants.
- WISC-Madison- On air interview on taser and firearm training.
- WKOW TV- Madison- On air interview on self-defense.
- WKOWTV- On air interview on Wisconsin changes to police shooting investigations.
- WKOWTV-Madison- On air interview on deadly force options for police.
- WMTV-Madison- On air interview on home safety practices.
- WMTV-Madison- On air interview on personal safety.
- WMTV-Madison- On air interview on taser and firearms training.

## CURRICULUM DEVELOPMENT CREDIT

- Building A Course Roadmap- Madison College (2021)
- Childcare Center Workplace Violence for Administrators- Madison College (2018, 2019)
- Childcare Center Workplace Violence for Employees Training- Madison College (2018)
- Choosing the Appropriate Tool from the Instructor Toolbox- Madison College (2021)
- Civilian Conceal Carry Training Manual- WI DOJ. (2010)
- Conceal Carry Considerations for Law Enforcement- Madison College (2012- Present)
- Creating and Assessing Measurable Outcomes- Madison College (2021)
- Criminal Investigations Theory (Degree Credit)- Madison College (2018)
- Criminology (Degree Credit)- Madison College (2019)
- Critical Incident Training for Hospitality Leaders- Madison College (2018, 2019)
- Defensive and Arrest Tactics Course for Law Enforcement- Wisconsin Dept. of Justice. (2204, 2008, 2012)
- Dells Area Response Emergency Exercise (2020)- Madison College
- Domestic Violence in the Workplace- Madison College (2020)
- Drone Basics- Madison College (2017)
- Electronic Control Device Manual- WI DOJ  (2004, 2008, 2010)
- Evacuating and Sheltering for the Workplace- Madison College (2020)
- Firearms Training Manual- WI DOJ. (2004, 2008, 2012)
- First Line Police Supervision for Law Enforcement and Correctional Officers- Madison College (2014, 2015, 2018)
- Focus on Quality- Madison College (2021)
- Force Issues for Today's Law Enforcement- Madison College. (2011- Present)
- Force Transition Course for Law Enforcement, Security, and Correctional Officers- Madison College. (2015)
- Formulating Grading Policies to Achieve Learning Outcomes-Madison College (2021)
- Introduction to Corrections (Degree Credit)- Madison College. (2010, 2011, 2012, 2016)
- Introduction to Criminal Justice (Degree Credit)- Madison College. (2010, 2011)
- Juvenile Law (Degree Credit)- Madison College. (2010, 2011, 2018)
- Learning to Take the Learner's Perspective- Madison College (2021)
- Private Sector Security Course (Degree Credit)- Madison College (2018)
- Professional Development for Public Safety (Degree Credit)- Madison College (2017)

- Public Safety Drone Applications- International Law Enforcement Educators & Trainers Association (2015)
- Report Writing (Degree Credit)- Madison College (2016)
- Self Defense and Force Issues for Security Personnel- Covance Labs. (2008)
- Self Defense for Campus Security Personnel- Madison College (2010, 2012)
- Small Business Security Practices – Madison College (2019)
- Split Cell Active Shooter Concepts-Madison College. (2011-Present)
- Split Cell Active Shooter Tactics for Law Enforcement- Columbia County (WI) Chiefs Association. (2008, 2009)
- Tactical Response for Law Enforcement- WI DOJ. (2004, 2008, 2012, 2015)
- Taser Civilian User Course- Taser International (2010)
- Threat Assessment for Workforce-Madison College (2020)
- Three Steps To Introduce Your Online Course- Madison College (2021)
- Total School Safety for K-12 Decision Makers- Madison College (2018)
- Traffic Theory (Degree Credit)- Madison College (2016)
- Unmanned Aerial Device for Public Safety Operations- Madison College. (2014- Present)
- Use of Force Investigations for Law Enforcement, Security, and Corrections. (2012- Present)
- Use of Force Investigations for Police Supervisors- Madison College. (2012- Present)
- Workplace Violence Scenario Training- Access Community Health (2017)
- Workplace Violence for Employees and Employers- Madison College (2020)
- Focus on Quality Online Course Building- Madison College (2021)
- Three Steps to Mitigate Civil Exposure in Police Use of Force Incidents- Madison College (2021).
- School Safety and Threat Mitigation- Wingra School. (2022)

## PUBLICATIONS

"An Analysis of A Nation-Wide Use of Force De-Escalation Policy And The Impact On Officer Safety." American Public University. (2017)

"Are de-escalation policies dangerous?"- *Police Magazine*. October 2017.

"De-bunking de-escalation*"- Law and Order Magazine*. Hendon Publishing, August 2017.

"Put Statistics to Work"- *Law and Order Magazine*. Hendon Publishing, October 2016.

"The Facts of Officer-Involved Shootings"- *Law and Order Magazine*. Hendon Publishing May, 2015.

"Lobby for Your Protection Before A Major Incident" *Officer Magazine*. Endeavor Business Media, February, 2023.

"Focus on Transition With De-Escalation Training"- *Officer Magazine*. Endeavor Business Media, March, 2023.

## PROFESSIONAL AND PERSONAL AFFILIATIONS

American Association of Educators

American Psychological Association

Forensics Expert Group-Registrant

Global Institute for Forensic Research

International Law Enforcement Educators and Trainers Association

International Association of Chiefs of Police

International Association of Correctional and Forensic Psychology

Police Forensic Psychology Association

Thomson Reuters Professional Witness Registry

Wisconsin Law Enforcement Training Officers Association

Wisconsin Musky Alliance

Wisconsin Psychology Association

## EXPERT WITNESS EXPERIENCE (2012-PRESENT)

Michael B. Kingsley v. Stan Hendrickson, et al., Case No. 12-3639
I testified as an expert witness for the plaintiff, Michael Kingsley, in US District Court (Western Wisconsin) in a case related to the use of force on Mr. Kingsley.

State of Wisconsin v. Charles J. Fabry. Case: 2013CF000609
I was retained as an expert witness in Wisconsin Circuit Court (Brown County) for the use of force on Charles Fabry. The case settled.

State of Wisconsin v. Jeremy J. Imhoff. Case: 2014CM000026, 2015CF000096
I was retained by the Dane County District Attorney's Office as an expert witness in use of force for the prosecution of Mr. Imhoff. The case was settled just prior to trial.

Michael B. Kingsley v. Stan Hendrickson et al., Case No 3:10-cv-00832
I testified as an expert for the plaintiff, Michael Kingsley, in US District Court (Western Wisconsin) in a case related to the use of force and Taser use on Mr. Kingsley. The original trial was successfully appealed by the plaintiff to the United States Supreme Court and was remanded down back to the original court of jurisdiction.

Katie Austin v. United States of America et al., Case No 15-CV-1207.
I was the defense expert hired by Coyne, Schultz, Becker, and Bauer, in the US District Court (Eastern Wisconsin) in a case related to the use of force by contracted security officers on Ms. Katie Austin. I testified in deposition on May 3, 2017. The matter was dismissed in summary judgement.

Estate of Christopher Davis v. Juan Ortiz, Walworth County (WI), et al. AI2:18-CV-01846. I was retained by Cade Law Group as the plaintiff's expert in a case involving a passenger in a vehicle that was shot and killed by a deputy during a drug investigation. I testified in deposition on July 26, 2019.

Jimmy L. Harris v. City of Milwaukee (WI), et al. 14CV1002. I was retained by Cade Law Group as the plaintiff's expert in the US District Court (Eastern Wisconsin) involving the improper stop, detention, frisk, and use of force on a motorist in the City of Milwaukee. I testified in the jury trial in March, 2020.

Estate of Marco Gomez v. Village of Forest Park (IL) & Daniel Miller, 18C910. I am retained as the plaintiff's expert by Action Injury Law in a case pending in US District Court (Northern Illinois). The case involves the shooting death of a suspect in a stolen vehicle. I testified in deposition on August, 2020 and February, 2021.

Akil Carter v. City of Wauwatosa (WI), 19-CV-1422. I am retained by Bertrand Law on behalf of the plaintiff in US District Court (Eastern Wisconsin)  regarding the detention and force used on a passenger in a motor vehicle. I testified in deposition for this case in July 2022.

Stephen Mark Davidson et al vs. Floyd County, Iowa et al., Case: 6:20-CV-2019. United States District Court (Eastern Iowa). I was retained as an expert in this case regarding the police practices of a drug-related search warrant to the home and body of Mr. Davidson. The case was dismissed October, 2021 in summary judgment and pending an appeal.

Jacob Blake v. Sheskey (WI) 2021-CV-00038. I was retained as the plaintiff's expert in 2020 by the law firm Salvi, Schostok, and Pritchard regarding the officer-involved shooting of Jacob Blake in Kenosha, Wisconsin.

The Estate of Isiah Lewis vs. Edmond (OK) Police Department. I was retained in 2020 by attorney Action Injury Law, in the pending civil suit in US District Court (Northern Oklahoma) regarding the officer-involved shooting of Isiah Lewis by Edmond, Oklahoma law enforcement officers. My review found that the officers were justified in using deadly force.

The Estate of Marc Nevarez vs. City of Chicago (IL). I was retained by Thedford Law Group in 2021 to review the shooting death of Marc Nevarez by a City of Chicago Police Officer, for the potential of a civil rights violation suit. My review found the officer was justified in using deadly force.

Jason Pero vs. Ashland County (WI) and Brock Mrdjenovich,  20 CV 984. United States District Court (Western District of Wisconsin). I was retained by Axley Brynelson Law in 2021 on behalf of the defense in the matter of an officer-involved shooting death of Jason Pero by Deputy Mrdjenovich of Ashland County, WI. I prepared an expert report for the defense and the case was dismissed in summary judgement in December 2021.

Estate of Daunte Wright v. Brooklyn Center (MN). I am retained by the plaintiff's attorney,  Romanucci and Blandin, in a case involving a motorist shot and killed by a law enforcement officer who mistook her handgun for a taser. Case is pending.

The Estate of Shannon Payne vs. Dane County Sheriff's Office (WI), 20CV-0512. United States District Court (Western District of Wisconsin). I was retained in 2021 by Cade Law Group on behalf of the plaintiff who died in custody at the Dane County (WI) jail. Case is pending.

Lucas Williams vs. City of Fort Wayne (IN). I am retained as the plaintiff's expert by Geisleman & Brown, in a case regarding the use of crowd control tactics during a civil rights protest. Expert report is filed, case is pending.

Denzel Taylor vs. City of Sikeston (MO). I am retained as the plaintiff's expert, Donlan-Brand, in a case regarding the use of deadly force on a shooting suspect. Case filing is pending.

Kurtz v. Steven Kunnath, et al Case No. CV-20-138 (MT). I am retained as the plaintiff's expert by Jami Rebsom Law regarding the use of physical force by the police on Mr. Kurtz in Livingston, MT. Expert report filed in January 2022 and defendants settled with plaintiffs in May, 2022.

Sikon v. Carroll County (OH). 20-CV-674. I am retained as the plaintiff's expert by Spangenberg, Shibley, and Liber in the shooting death of a suspect who attempted to flee arrest. Testified in deposition December, 2022.

Kramer v. Dekalb (IL). I am retained as the plaintiff's expert, Duncan Law Group, to review the case of a mentally impaired man who was  wielding a sword and was shot and killed by law enforcement. Case is pending.

Bernard Kersh v. City of Chicago 20-L-001518. I am retained by the plaintiff's attorney, Hart, McLaughlin, and Eldridge, involving the use of physical force on Bernard Kersh by by Chicago Police Department. Testified in deposition November, 2022.

Joseph Walker v. City of Milwaukee et al. 20-CV-0487. I am retained by the plaintiff's attorney, OVB Law, involving the use of deadly force on an alleged unarmed citizen by Milwaukee Police officers. Case is pending.

Espino v. Mistretta. I am retained by Conybeare Law Office to review the arrest tactics of a Hartford (MI) police officer upon Mr. Espino. Case is pending.

State v. Flannery (WI). I was retained by Kuchler & Cotton to review officer's use of force and tasing of Dennis Flannery in the State of Wisconsin. My review offered an opinion the officers were justified in their force actions.

Cheyenne Finley v. William White, et al (IL).. I am retained by Schultz and Myers to review a case regarding a juvenile injured by a police officer during a school bomb threat. Case is pending.

Lawrence Montoya v. City of Denver (CO). 16cv1457. I am retained by the law firm of Fisher and Brialysen to opine on police procedures when writing affidavits. Expert report filed.

Cordova v. Alberquerque (NM). 14-2083. I am retained by the law offices of Ryan Villa to opine on police tactics in an officer-involved shooting.

Erik Lopez v. Las Cruces (NM) Police. I was retained by the law offices of Ryan Villa to review the K-9 deployment on Erik Lopez. My review found the officers were justified in their actions.

Jesus Lopez v. Albuquerque (NM) Police. I was retained by the law offices of Ryan Villa to review the officer-involved shooting death of Jesus Lopez. My review found the officers were justified in their actions.

Estate of Ryan Mitchell v. City of Waupun Police Department (WI) 21-CV-322. I am retained by the law firm, Von Briesen & Roper, on behalf of the defense to opine on the actions of an officer during a mental health investigation. Case is pending.

Woodard v. Schopp, Bahling, et al 22-CV-0005827. I am retained by Cade Law Group to opine on the actions of Wisconsin State Troopers investigating a disabled motorists. Expert report filed January, 2023.

Pierce v. Robbins. I am retained by Conybeare Law Offices to opine on the use of force on an inmate in the Berrian County (MI) Jail.