IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DEMOND HARRIS,

                              Plaintiff,

        v.                                                    OPINION and ORDER

CITY OF LA CROSSE, GRAHAM EDDY,                               23-cv-62-jdp
CRAIG TEFF, and SAM CLASON,

                              Defendants.

---

        Not everything that passes muster under the Fourth Amendment is good police policy. For some reason, La Crosse is the only city in Wisconsin that delivers municipal citations with police traffic stops, instead of just mailing the citations like other Wisconsin cities. This practice increases the number of traffic stops, leading to avoidable confrontations between citizens and police officers, as this case illustrates.

        The La Crosse Police Department had issued citations to Demond Harris for reckless driving and disorderly conduct. Harris did not receive the citations at the scene, because no officers were there during the incident at issue, and Harris chose not to answer the door when an officer came to his house. But instead of mailing the citations to Harris, officer Graham Eddy initiated a traffic stop three days later to deliver the citations.

        The delivery of routine municipal citations quickly escalated. Officer Eddy told Harris that there was a strong odor of marijuana coming from inside the car, and he directed Harris to get out so Eddy could conduct a search. Harris denied that he had any marijuana, and he refused repeated orders to exit, first from Eddy and then from two other officers who arrived, defendants Craig Teff and Sam Clason. The standoff lasted for nearly half an hour until Harris finally got out of his car as the officers were preparing to break a window. A few minutes later,

Harris was tased, on the ground, handcuffed, with an officer's knee on his back. Harris was then taken to the county jail and strip searched. Neither the officers nor jail staff found any drugs on Harris or in his car. All charges were eventually dropped.

Harris contends that nearly everything the officers did violated his Fourth Amendment rights: the traffic stop, the extension of the stop to search for marijuana, the uses of force, the arrest, and the strip search. He also contends that the policy of the City of La Crosse to stop drivers simply to deliver tickets for ordinance violations is unconstitutional. Defendants move for summary judgment on most of Harris's claims.

Harris isn't blameless here: he obstinately refused Eddy's lawful orders to get out of his car, and he physically resisted the officer's efforts to arrest him. But his frustration is understandable. He wasn't carrying any drugs, and the whole episode could have been avoided if the La Crosse Police Department had simply mailed the citations to him. As any police officer knows, every traffic stop creates a risk of harm for the officer and the driver. Defendants do not explain why they believe the benefits of the practice outweigh its costs, both in terms of safety risks and the diversion of resources from more important matters. The La Crosse Police Department should reconsider its unusual practice.

But the question before the court is not whether it is a good idea to use police traffic stops to deliver municipal citations. The question is whether defendants' conduct violated the Fourth Amendment. Under the law of this circuit, the stop was lawful. The Court of Appeals for the Seventh Circuit held more than two decades ago that a traffic stop based on probable cause is permitted under the Fourth Amendment, regardless of how serious the offense was or whether the offense was committed in the officer's presence. *Woods v. City of Chicago*, 234 F.3d 979 (7th Cir. 2000). The citations at issue in this case were based on multiple eyewitness

statements, so probable cause supported the stop. And because the stop was lawful, Eddy had authority to order Harris out of his car, regardless of whether Eddy had reasonable suspicion that marijuana was in Harris's car. The officers also had probable cause to arrest Harris, not just for the municipal violations, but also for refusing to get out of his car for nearly half an hour. So the court will grant summary judgment to defendants on Harris's claims regarding the traffic stop, the extension of the stop, and the arrest.

The court must allow some of Harris's claims to go forward. The parties offer opposing testimony regarding whether the use of the taser was justified, and the videos from the officers' body cameras do not resolve those disputes, so a jury will have to resolve the excessive force claim over the taser. Defendants' opening brief did not address the claims regarding the pressure on Harris's back or the strip search, so defendants forfeited their right to obtain summary judgment on those claims. And even if the point were not forfeited, the arguments defendants make for the first time in their reply brief do not show that they are entitled to judgment as a matter of law based on undisputed facts.

## UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

On February 25, 2020, two tree trimmers in La Crosse, Wisconsin called the police about an incident that had just occurred in the alley where they were working. Both of them gave written statements. They said that a black male in his 30s drove down the street at around 40 miles per hour. The man slammed on the brakes to avoid hitting a passing car; he stopped so suddenly that he left skid marks on the road. The man then ran over a utility sign, hit a garbage can, and nearly hit a worker who was standing nearby. The man got out of the car and

began yelling and swearing. He threw the traffic cones out of the alley. He got back into his car, drove into the job site, and nearly hit one of the workers. He then parked his car and got out, continuing to yell, swear, and use "vulgar hand signals" before going inside his house. Dkt. 40-5 and Dkt. 40-6.

Based on the tree trimmers' statements, a La Crosse police officer named Justin Eddy (defendant Graham Eddy's brother) drafted a citation for Harris for reckless driving and disorderly conduct. The witness statements do not name the suspect, and the parties do not say how the officer identified Harris. Although Harris disputes the tree trimmers' account in many respects, *see* Dkt. 53, ¶ 101, he does not dispute that he was the man they were referring to, and he does not challenge the officer's factual basis for concluding that Harris was the person involved in the incident.

After the incident, Justin Eddy telephoned Harris's domestic partner, Misty Martin. Dkt. 43 (Martin Dep. 58:11–60:6). (The parties do not say why Eddy called Martin instead of Harris.) Eddy told Martin about the tree trimmers' allegations and that "he wanted to give tickets to" Harris. *Id.* at 59:24–25. Martin passed the conversation along to Harris, including "that the officer might issue [Harris] some tickets." Dkt. 21 (Harris Dep. 28:6–24). Later that day, a La Crosse police officer (the parties do not say who) knocked on Harris's door. Harris saw the officer through the window, but Harris decided not to answer, in part because he believed the tree trimmers were "lying," and in part because he "didn't want any more tickets." *Id.* at 27:14–28:10.

Three days later at around 7:30 p.m., Graham Eddy, also a La Crosse police officer, was patrolling the neighborhood where Harris lives. Eddy was aware from reviewing his dashboard computer that Harris had pending citations for reckless driving and disorderly conduct. Eddy

was aware of what Harris looked like from "prior booking photographs." Dkt. 52, ¶ 32. Eddy saw an individual get into a car in front of Harris's residence. Eddy ran the license plate and learned that it was registered to Martin, who Eddy knew was "associated" with Harris. *Id*, ¶ 27. (The parties do not say how Eddy knew this.) Eddy shined a light toward the car, which allowed him to identify the driver as Harris. Harris drove away, but Eddy followed him and then initiated a traffic stop a couple minutes later.

When Eddy approached the car, Harris slightly cracked his window.[1] Eddy told Harris that he had two citations to deliver for the incident on February 25. Harris knew that Eddy was referring to the incident with the tree trimmers. Eddy asked Harris for his license and proof of insurance, but Harris did not have either with him. Eddy also asked Harris, "How much marijuana is in here?" (Eddy alleges that a "strong odor" of marijuana was coming from inside Harris's car.) Harris replied that there was none. Eddy continued asking Harris about marijuana, and Harris continued denying that he had any. Eddy told Harris that he would "just write [Harris] a ticket" if he turned over the marijuana; otherwise, "the standard procedure" would be to pull Harris out of the car and search him. Harris said that Eddy had "no right" to pull him out of the car, and he asked Eddy for his tickets. Eddy told Harris that he would prepare the tickets, and then he would ask Harris to step out of the vehicle. While Eddy was talking to Harris, defendant Sam Clason, another La Crosse police officer, arrived on the scene.

---

[1] Some of the facts in the remainder of this section come from three videos from the body cams of the individual defendants. Dkt. 28-4; Dkt. 38-2; Dkt. 39-2. The court was originally unable to play the video from Eddy's body cam past the 25-minute mark, so the court directed the parties to submit a new copy of the video. Dkt. 54. The replacement copies, Dkt. 55 and Dkt. 56, had the same problem. Sullivan then provided a third a copy of the video. Dkt. 57. That copy played all the way through, but the audio and video were out of sync approximately 20 seconds. Ultimately, the court was able to use a different media player to play the original video.

Eddy went back to his car, called his supervisor Craig Teff, and prepared the tickets. While Eddy was still in the squad car, Teff arrived and began talking to Harris. Teff directed Harris to get out of the car, telling Harris that they would break the window if they have to. Harris did not get out of the car. Around the same time, Martin arrived, and she gave the officers Harris's driver's license and proof of insurance.

About 15 minutes after he went to his squad car, Eddy returned to Harris's car. Eddy told Harris that he would get an obstructing charge if he did not get out of the car. Harris did not get out of the car. This continued for approximately another 10 minutes. Eddy repeatedly told Harris that he detected a strong odor of marijuana coming from Harris's car, that Harris needed to get out of the car, that he would be charged with obstruction, and that the officers would break the window with a window punch if necessary. The other officers also stated that they smelled marijuana.

As the officers prepared the window punch, Harris exited his vehicle. After that point, events moved quickly, and the body cameras are less useful because of how fast the parties were moving and because the cameras were often too close to the parties to show what was happening. But here are the basics: Harris walked around his car and stood on the sidewalk, as directed by the officers. As he continued walking backward, two officers grabbed hold of his arms. They pressed him up against his car and told him they were putting him in handcuffs. Harris resisted placing his arms behind his back. A few seconds later, Harris was on the ground while a struggle ensued. A few seconds after that, Harris stood up, and Teff deployed his taser on Harris's lower back. Harris fell to the ground. Dkt. 28-4 (Eddy cam 31:40–32:57).

Once Harris was on the ground again, he stayed there. He remained prone while the officers handcuffed him behind his back. At different points, Eddy and Clason had a knee on

Harris's back. Harris shouted multiple times that he could not breathe. But when officers asked Harris whether he needed medical attention, he stayed silent.

Eventually, Harris was taken to the county jail. No marijuana or other drugs were found in his car or on Harris during a patdown search, but Eddy told jail staff that he believed Harris was hiding drugs around his crotch. Harris was later strip searched, but no drugs were found. (Harris's blood was not tested for THC.) The charges against Harris were later dismissed.

The court will discuss additional facts as they become relevant to the analysis.

ANALYSIS

## A.  Summary of claims

This first issue is a basic one: what are the claims that Harris is asserting in this case, and what claims are the subject of defendants' summary judgment motion? The court understands from Harris's complaint and summary judgment brief that he is asserting the following claims under the Fourth Amendment:

1)  Eddy stopped Harris's vehicle without reasonable suspicion that he was committing or was about to commit a crime.

2)  City policy caused the traffic stop.

3)  Eddy extended the stop by falsely asserting that he smelled marijuana, and Teff and Clason failed to intervene.

4)  All individual defendants arrested Harris without probable cause.

5)  Clason used excessive force by using a "push in and pull down" technique on Harris, and Eddy and Teff failed to intervene.

6)  Teff used a taser on Harris, and Clason and Eddy failed to intervene.

7)   Clason and Eddy placed pressure on Harris's back with their knees, restricting his breathing, and Teff failed to intervene.

8)  Eddy caused Harris to be strip searched at the jail.

9)  The city is required to indemnify the officers for any damages awarded against them.

Harris did not list all the above claims in his complaint, but he did include the factual basis for each of them. Plaintiffs are required to plead facts not legal theories, so the complaint provided fair notice of the above claims under federal law. *See Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014); *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011); *Stabenow v. City of Eau Claire*, 546 F. Supp. 3d 787, 805 (W.D. Wis. 2021). Harris's complaint also includes a claim that the city had an unconstitutional policy on excessive force, Dkt. 1, ¶ 64d, but Harris does not respond in his brief to defendants' summary judgment motion on this issue, so Harris forfeited that claim. *See Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1078 (7th Cir. 2016).[2]

Harris's brief discusses three other claims: (1) defendants used excessive force by handcuffing Harris; (2) while the taser was in drive-stun mode, Teff activated it a second time while Harris was lying on the ground; and (3) defendants stopped Harris from recording their conduct with his cellphone, in violation of the First Amendment. In his proposed findings of fact, Harris also alleges that Eddy "decided to deny Harris a right to post bond, an opportunity to bail out of jail, meaning Harris would have to stay in the jail overnight." Dkt. 53, ¶¶ 73–75. Harris did *not* include the factual basis for these claims in his complaint, and he may not amend

---

[2] Harris includes a conclusory assertion in his proposed findings of fact that the city failed to properly train its officers on excessive force. Dkt. 53, ¶ 112. The court will disregard that proposed fact because parties may not include legal arguments in their proposed findings of fact, *see* Motions for Summary Judgment I.B.6, *attached* to Dkt. 11, and because Harris provides no factual support for the argument, *see Dorris v. Unum Life Ins. Co. of Am.*, 949 F.3d 297, 306 (7th Cir. 2020).

his complaint with his summary judgment brief or his proposed findings of fact, *see Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012), so the claims are outside the scope of the case.[3]

Defendants purport to move for summary judgment on all claims except the indemnification claim, which defendants say will be moot if the court dismisses the other claims. Defendants also move for summary judgment on the question whether Harris can meet the standard for punitive damages. Defendants' opening summary judgment brief does not address the claim that officers restricted Harris's breathing by placing a knee on his back and that Eddy subjected Harris to a strip search. Moving parties have the initial burden to explain why they are entitled to summary judgment. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011). So defendants' failure to address these claims in their opening brief means they forfeited their right to obtain summary judgment on the claims.

On a motion for summary judgment, the question is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or, stated another way, whether a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). For the reasons below, the court concludes

---

[3] Even if Harris had included those claims in his complaint, they would fail. Officers may place a suspect in handcuffs when they have probable cause to arrest, *see U.S. v. Radford*, 39 F.4th 377, 388 (7th Cir. 2022), as defendants in this case did. Harris's claim regarding the second use of the taser is not supported by the evidence. Harris does not cite his own testimony that the officers used the taser a second time, and the evidence he does cite (the videos and defendants' testimony) shows only that Teff placed the taser against Harris's leg, not that he activated the taser. Harris's arguments regarding defendants taking his phone and refusing to allow him to immediately post bond are undeveloped and therefore forfeited. *See Irish v. BNSF Ry. Co.*, 674 F.3d 710, 714–16 (7th Cir. 2012).

that defendants are entitled to summary judgment on the claims regarding the lawfulness of the stop, the arrest, and the use of the pull in and push down technique. But there are genuine issues of material fact that preclude summary judgment on the claim regarding the use of the taser. The court will grant summary judgment to defendants on the issue of punitive damages on all claims except the excessive force claim related to placing pressure on Harris's back and the strip search claim.

## B.  Traffic stop

Eddy stopped Harris based on a suspicion that Harris had violated municipal ordinances against reckless driving and disorderly conduct. Harris does not dispute that the conduct alleged by the tree trimmers—driving erratically, hitting a utility sign and a garbage can, throwing traffic cones, yelling and swearing at the tree trimmers, and twice nearly driving into one of them—would satisfy the elements for reckless driving and disorderly conduct. He also does not dispute that Eddy had reasonable suspicion that Harris had violated those ordinances. But Harris contends that traffic stops based on past conduct must be authorized by a warrant unless the suspected violation is a felony. Harris says that the stop in this case violated the Fourth Amendment because Eddy suspected him of past municipal violations only, and Eddy did not have a warrant. Harris also contends that the city has a policy of encouraging officers to stop suspects for municipal citations without a warrant, so the city is also responsible for the unconstitutional stop.

### 1.  Eddy

Eddy asserts a qualified immunity defense, which means that Harris must show not only that Eddy violated his rights, but also that his rights were clearly established at the relevant

time.[4] Eddy can meet this burden by pointing to either: (1) a closely analogous, binding case that was decided in his favor; (2) a more general constitutional rule that applies "with obvious clarity" to the defendant's conduct. *Cibulka v. City of Madison*, 992 F.3d 633, 639–40 (7th Cir. 2021). In deciding whether a defendant is entitled to qualified immunity on a motion for summary judgment, the court must decide whether the defendants violated the plaintiff's clearly established rights when the evidence is viewed in the light most favorable to the plaintiff. *Jerger v. Blaize*, 41 F.4th 910, 913 (7th Cir. 2022); *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017).

Harris initially filed his own motion for summary judgment about the lawfulness of the stop, Dkt. 34, but the court denied the motion without briefing because Harris did not address the issue of qualified immunity, Dkt. 41. Harris now asks the court to grant summary judgment to him on this claim sua sponte. The court will deny that request because the court concludes that Eddy is entitled to summary judgment on this claim for two reasons: (1) the law is not clearly established that the Fourth Amendment prohibits traffic stops based on reasonable suspicion of past criminal activity unless the crime is a felony; and (2) the undisputed facts show that Eddy had probable cause that Harris committed by municipal and state offenses, and a warrant is not needed under those circumstances, regardless of seriousness of the offense or whether the offense was committed in the officer's presence.

---

[4] Qualified immunity does not apply to injunctive or declaratory relief, *see Kikumura v. Turner,* 28 F.3d 592, 596 (7th Cir. 1994), but Harris does not contend in his summary judgment brief that he is entitled to either form of relief.

### a.   Reasonable suspicion

Both sides focus primarily on the question whether reasonable suspicion justified the stop. It is well established that "police may conduct an investigatory stop of an individual when the officer has reasonable suspicion that a crime has occurred." *D.Z. v. Buell*, 796 F.3d 749, 754 (7th Cir. 2015). Harris cites numerous cases to support a proposition that the officer must have reasonable suspicion that a crime either is occurring or is about to occur; reasonable suspicion of completed crimes is sufficient only if the crime is a felony. But none of the cases Harris cites clearly establishes that view in this circuit.

Only one Supreme Court case has directly addressed the issue, and that case expressly left the issue open. In *United States v. Hensley*, the question was whether Fourth Amendment prohibited officers from stopping the defendant based on reasonable suspicion that he had committed a robbery 12 days earlier. 469 U.S. 221, 226 (1985). The Court acknowledged that a "stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity" and that "[p]ublic safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law." *Id.* at 228–29. Nevertheless, the Court upheld the stop, holding as follows: "[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *Id.* at 229. The Court did "not decide . . . whether . . . stops to investigate all past crimes [based on reasonable suspicion], however serious, are permitted." *Id.* Neither side cites any subsequent Supreme Court cases that provide further guidance on the issue.

12

As for the Seventh Circuit, Harris relies primarily on *United States v. Lopez*, 907 F.3d 472 (7th Cir. 2018), which involved the arrest of a man suspected of dealing drugs. Most of the court's discussion was devoted to explaining that the officers did not have reasonable suspicion to stop the man because the tip they received from an informant was not sufficiently reliable. *Id.* at 476–84. Near the end of its discussion, the court noted that the police had "strayed from the hallmark justifications of *Terry* stops" because "[n]o urgent circumstances excused the officers from abandoning the Fourth Amendment's warrant requirement, which must be observed 'whenever practicable.'" *Id.* at 484 (quoting *Terry*, 392 U.S. at 20). The court then distinguished cases cited by the government because they "involved an officer's own observations, ongoing emergencies, or ongoing crimes." *Id.* It cited *Hensley* for the proposition that "investigative stops related to completed crimes must be distinguished from investigative stops related to ongoing or imminent crimes because the governmental interest in preventing and stopping crimes and threats to public safety is more attenuated once a crime has been completed." *Id.* at 485. The court concluded by again emphasizing that the tip the officers relied on was "unreliable and uncorroborated." *Id.*

*Lopez* provides some support for a view that courts should distinguish between stops based on suspicion of past offenses and those based on ongoing crimes. The court reiterated a similar view in *United States v. Howell*, 958 F.3d 589, 599 (7th Cir. 2020), when it said that a "call to police is less likely to support reasonable suspicion in the *Terry* analysis when it does not describe an ongoing crime or emergency." But neither *Lopez* nor *Howell* announced a new rule that reasonable suspicion of a past offense cannot justify a stop, and neither case identified a test for assessing such a stop, instead suggesting that it was a factor to consider. In both cases, the court first discussed that the information officers relied on lacked reliability. And the court's

13

approach in *Howell* was nuanced: the court concluded that the tip at issue provided reasonable suspicion for a stop, but not for a frisk. 958 F.3d at 598–600. *Lopez* included the statement that officers should obtain a warrant whenever it is "practicable" to do so, but the Supreme Court has made it clear that is not a Fourth Amendment requirement: "Law enforcement officers may find it wise to seek arrest warrants where practicable to do so, . . . [b]ut we decline to transform this judicial preference into a constitutional rule." *U.S. v. Watson*, 423 U.S. 411, 423–24 (1976).

Harris also cites *United States v. Jackson*, 300 F.3d 740 (7th Cir. 2002), contending that it holds that "[t]he law in the Seventh Circuit requires that the conduct must be ongoing or to occur shortly in the future for the stop to be legal." Dkt. 50, at 6. But *Jackson* does not include that holding. The case includes the statement that "[r]easonable suspicion is some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Id.* at 745. But the court did not consider the difference between stops based on current crimes and stops based on past crimes. Rather, the court simply held that it "was reasonable to suspect that [the defendant] was engaging in drug-related activity" based on the officer's observations. *Id.* at 746. There are numerous Seventh Circuit cases in which the court has articulated the reasonable suspicion standard as applying to both past and ongoing crimes.[5] So neither the

---

[5] *See, e.g., U.S. v. Swinney*, 28 F.4th 864, 866 (7th Cir. 2022) ("Police officers may detain a suspect for a brief investigatory stop if they have a reasonable suspicion based on articulable facts that a crime is about to be or has been committed."); *D.Z.*, 796 F.3d at 754 ("Reasonable suspicion is more than a hunch—when an officer initiates a *Terry* stop, he must be able to point to specific facts that suggest that a stopped individual has committed, was committing, or is about to commit an offense."); *U.S. v. Booker*, 579 F.3d 835, 838 (7th Cir. 2009) ("[P]olice may initiate an investigatory stop—a *Terry* stop—when the officer has reasonable suspicion that a crime occurred); *U.S. v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008) ("*Terry* stops are permissible so long as they are supported by reasonable and articulable suspicion that the suspect has committed a crime or is about to do so.").

14

Supreme Court nor the Court of Appeals for the Seventh Circuit has held that stops cannot be based on reasonable suspicion of completed minor offenses.

If Supreme Court or Seventh Circuit law is not directly on point, a plaintiff may also overcome a qualified immunity defense with "a robust consensus of cases of persuasive authority." *Bradley v. Village of University Park, Illinois*, 59 F.4th 887, 904 (7th Cir. 2023). But the cases Harris cites do not add up to a robust consensus. *United States v. Fleming*, No. 18-cr-197, 2019 WL 486073, at *8–9 (E.D.N.Y. Feb. 6, 2019), and *United States v. Haynesworth*, 879 F. Supp. 2d 305, 311–12 (E.D.N.Y. 2012), simply noted that it was an open question in the Second Circuit whether "a *Terry* Stop to investigate a completed crime is forbidden." In both cases, the courts concluded that the stop at issue was permissible under the Fourth Amendment.

In a footnote in *Gaddis ex rel. Gaddis v. Redford Township*, 364 F.3d 763, 771 n.6 (6th Cir. 2004), the court summarized its previous case law as holding that "[p]olice may also make a stop when they have reasonable suspicion of a completed felony, though not of a mere completed misdemeanor." That statement was not relevant to the court's holding, which upheld the stop. *Id.* at 771. In a later case, the court clarified that there is no "across-the-board prohibition on stops to investigate completed non-felonies." *U.S. v. Jones*, 953 F.3d 433, 436 (6th Cir. 2020). The court concluded that the validity of the stop depends on the "facts and circumstances" of the case, including "the nature of the crime, how long ago the suspect committed it, and the ongoing risk of the individual to the public safety." *Id.* at 437. *Jones* cited cases in the Eighth, Ninth, and Tenth circuits that had also adopted a similar balancing approach. *U.S. v. Hughes*, 517 F.3d 1013, 1017–18 (8th Cir. 2008); *U.S. v. Grigg*, 498 F.3d 1070, 1076–77, 1081 (9th Cir. 2007); *U.S. v. Moran*, 503 F.3d 1135, 1141–43 (10th Cir.

2007); *but see Atwater v. City of Lago Vista*, 532 U.S. 318, 347 (2001) ("[W]e have traditionally recognized that a responsible Fourth Amendment balance is not well served by standards requiring sensitive, case-by-case determinations of government need, lest every discretionary judgment in the field be converted into an occasion for constitutional review."). But at least two state courts have rejected the present/past and felony/misdemeanor distinctions, concluding that the same reasonable suspicion standard applies to all stops. *Wilson v. State*, 935 So. 2d 945, 951 (Miss. 2006); *State v. Blankenship*, 757 S.W.2d 354, 357 (Tenn. Crim. App. 1988).

Other than *Gaddis*, Harris did not cite any of the cases mentioned in the preceding paragraph, and he did not explain why he would be entitled to relief under a balancing test like the one in *Jones*. Rather, his position is that the Fourth Amendment categorically bars the police from initiating a stop based on reasonable suspicion of a past crime unless it is a felony. Harris identifies no case law holding that. But even if the court were to conclude that Eddy violated the Fourth Amendment under a balancing test, Harris has not shown that the stop violated his clearly established rights. The court will grant summary judgment to Eddy on this claim.

**b.  Probable cause**

Even if Harris is correct that a police officer may not initiate a stop based on reasonable suspicion of a non-felony committed in the past, Eddy is entitled to summary judgment because he did not rely just on reasonable suspicion, he had probable cause. Harris contends that a warrant is always required for a non-felony crime committed outside the officer's presence, but that is not the law in this circuit.

At the time Eddy stopped Harris, Harris had been cited for violating municipal ordinances against reckless driving and disorderly conduct. Those ordinances are simply

municipal corollaries of state-law offenses. *See* Wis. Stat. § 346.62(2) ("No person may endanger the safety of any person or property by the negligent operation of a vehicle."); Wis. Stat. § 947.01(1) ("Whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor."). Eddy did not know the factual basis for the citations, but he didn't need to. Under the collective knowledge doctrine, one officer may rely on the assessment of another officer, so long as that other officer had personal knowledge of facts that would give her probable cause. *See U.S. v. Williams*, 627 F.3d 247, 252–53 (7th Cir. 2010). A police officer has probable cause to arrest if a reasonable person would believe, based on the facts and circumstances known at the time, that a crime had been committed. *McBride v. Grice*, 576 F.3d 703, 707–08 (7th Cir. 2009).

Harris does not dispute that Eddy had probable cause that Harris had engaged in reckless driving and disorderly conduct because the citations were based on two eyewitness statements. "[A]n identification by even one eyewitness who lacks an apparent grudge against the accused person is sufficient to demonstrate probable cause." *Moorer v. City of Chicago*, 92 F.4th 715, 721 (7th Cir. 2024). The witnesses were apparently reliable in this case because they provided consistent, detailed accounts, they identified themselves, and they had no apparent motive to lie about Harris.[6] Harris criticizes the police department for not interviewing him, but he admits that he did not answer the door when an officer came to his

---

[6] In his proposed findings of fact, Harris says that he believes the tree trimmers were lying as part of an attempt by his neighbor to retaliate against him. Dkt. 53, ¶ 102. But he provides no basis for that assertion, and, more important, he identifies no reason why anyone with the police department would have reason to know about this alleged plot.

house. In any event, "[t]he general rule is that when the police have information from a reasonably credible witness that a person has committed a criminal act, they may rely on that witness's account, even when the suspect himself denies wrongdoing." *Seiser v. City of Chicago*, 762 F.3d 647, 654–55 (7th Cir. 2014).

When an officer has probable cause that a suspect committed a crime—past or present, felony or nonfelony—he may stop that suspect when he is in public, without or without a warrant. *Hensley* itself was based on that assumption. The Court repeatedly framed the question as whether officers may stop someone based on suspicion of a past crime in the *absence* of probable cause.[7]

Any uncertainty left by *Hensley* was resolved in *Woods v. City of Chicago*, 234 F.3d 979 (7th Cir. 2000), a case that both sides ignore. *Woods* rejected the view that "a police officer violates the Fourth Amendment merely by arresting someone without a warrant for a misdemeanor offense which did not occur in the officer's presence." *Id.* at 992. Rather, when the arrest occurs outside the suspect's home, "his arrest would not violate the Fourth Amendment unless the arresting officers lacked probable cause." *Id.* at 993. More recently, the court held that a warrantless arrest was not invalid simply because alleged conduct occurred three weeks earlier: "The mere passage of time does not necessarily dissipate the probable cause for an arrest." *U.S. v. Haldorson*, 941 F.3d 284, 291 (7th Cir. 2019); *accord State v. Williams*,

---

[7] *See Hensley*, 469 U.S. at 227 ("We do not agree with the Court of Appeals that our prior opinions contemplate an inflexible rule that precludes police from stopping persons they suspect of past criminal activity unless they have probable cause for arrest."); *id.* at 228 (past cases "suggest that the police are not automatically shorn of authority to stop a suspect in the absence of probable cause merely because the criminal has completed his crime"); *id.* ("When this balancing test is applied to stops to investigate past crimes, we think that probable cause to arrest need not always be required."); *id.* at 229 ("Restraining police action until after probable cause is obtained would . . . only hinder the investigation.").

2002 WI App 306, ¶ 17, 258 Wis. 2d 395, 655 N.W.2d 462, 467–68 (2002) ("While the proximity in time to the crime is a relevant factor in determining the constitutionality of an investigative detention of a suspect, there is no fixed requirement of how soon after the crime the stop must occur.").

The Supreme Court has also held that the validity of an arrest outside the home turns on probable cause, not a warrant. In *Atwater*, 532 U.S. at 323, the Court concluded that the Fourth Amendment does not prohibit a warrantless arrest, even for minor offenses punishable only by a fine. The Court could not have been clearer: "[T]he standard of probable cause applies to all arrests, without the need to balance the interests and circumstances involved in particular situations." *Id.* at 354 (internal quotation marks and alterations omitted). If an officer can *arrest* a suspect based on probable cause for a non-felony offense committed outside the office's presence, it necessarily follows that a stop under the same circumstances is also justified under the Fourth Amendment. *See Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1114 (7th Cir. 2013) ("[T]he existence of probable cause renders both traffic stops and resulting warrantless arrests permissible.").

It is true that the state statute being challenged in *Atwater* authorized arrests only when the offense was committed in the officer's presence, and the Court limited its holding to that situation: "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater*, 532 U.S. at 354. It is also true that the Court reviewed the history of arrests at common law, noting that the "usual rule at common law was that a police officer could arrest without warrant one guilty of a misdemeanor if committed in his presence." *Id.* at

329 (internal quotation marks and alterations omitted). But the Court did not hold that crimes committed outside an officer's presence require a warrant.

In *Woods*, the court of appeals reviewed the same history, along with numerous Supreme Court precedents. The court of appeals concluded that the Supreme Court has not "constitutionalize[d] the common law rules regarding misdemeanor arrests," but rather has consistently upheld warrantless arrests outside the home, so long as they are supported by probable cause. 234 F.3d at 993–94. The court of appeals also observed that other circuits "have uniformly held or stated that the common law 'in the presence' rule is not part of the Fourth Amendment." *Id.* at 995. *Atwater* was decided a year after *Woods*, but *Atwater* did not expressly or implicitly overrule *Woods*, and this court is not aware of any case law in the subsequent 20 years that has called *Woods* into question. So *Woods* is controlling.

Harris relies on *City of Milwaukee v. Nelson*, 149 Wis. 2d 434, 439 N.W.2d 562, 571 (1989), which includes the following statement: "An officer . . . may make a warrantless arrest [for an ordinance violation] only if the ordinance violation was committed in the officer's presence unless other factors existed." *Nelson* does not help Harris for four reasons.

First, Eddy had probable cause to stop Harris not just for ordinance violations, but also for state laws against reckless driving and disorderly conduct. Although Harris was not cited for state-law violations, that doesn't matter. The test under the Fourth Amendment is objective, so the question is simply whether probable cause existed for an offense, not whether that offense was the motivation for the stop. *Whren v. U.S.*, 517 U.S. 806, 819 (1996). So *Nelson* simply does not apply.

Second, the quoted statement in *Nelson* was not part of the court's holding, which was that it was permissible under the Fourth Amendment for a municipality to authorize

warrantless arrests based on probable cause that the suspect "is violating or has violated the ordinance." 439 N.W.2d at 572. The court did not explain its statement that a violation must occur "in the officer's presence," and the only authority the court cited for its statement was a dissenting opinion from another case.

Third, the dissenting opinion cited in *Nelson* made it clear that the "in the officer's presence" requirement was based on the author's interpretation of state law, not the Fourth Amendment. *See State v. Welsh*, 108 Wis. 2d 319, 321 N.W.2d 245, 257 (1982) (Abrahamson, J., dissenting). "[S]tate law does not control the reasonableness inquiry under the Fourth Amendment." *Jackson v. Parker*, 627 F.3d 634, 640 (7th Cir. 2010). "A state may choose to protect privacy beyond the level that the Fourth Amendment requires, but the Fourth Amendment requires only that an arrest be based upon probable cause." *Hurem v. Tavares*, 793 F.3d 742, 746-47 (7th Cir. 2015) (internal quotation marks and alterations omitted).

Fourth, even if state courts had interpreted the Fourth Amendment as requiring warrants for non-felony crimes committed outside the officer's presence, federal courts are not bound by state court decisions on issues of federal law. *RAR, Inc. v. Turner Diesel, Ltd*., 107 F.3d 1272, 1276 (7th Cir. 1997). Rather, this court must follow the Court of Appeals for the Seventh Circuit, which has made clear in decisions like *Woods* that warrantless arrests are allowed under the Fourth Amendment, regardless of what the offense is and regardless of whether the offense occurred in the officer's presence.

The bottom line is that Eddy had probable cause to stop Harris for reckless driving and disorderly conduct, and that was all Eddy needed to justify the stop, regardless of when the offenses occurred, how serious the offenses were, or whether he had a warrant. Under the law

of this circuit, Eddy did not violate the Fourth Amendment, even without considering the issue of qualified immunity. The court will dismiss this claim.

### 2. Municipal liability

Harris contends that La Crosse can be held liable for the traffic stop because the city has a policy of allowing its officers to stop suspects without a warrant based only on municipal citations. But the court has already determined that the stop did not violate the Fourth Amendment, and the city cannot be held liable if there was no underlying constitutional violation. *See Houskins v. Sheahan,* 549 F.3d 480, 493–94 (7th Cir. 2008). So the court will dismiss the claim against the city.

## C. Extension of stop

Harris contends that all of the officers violated the Fourth Amendment when they extended the stop by ordering him to exit his vehicle. Harris says that the stated reason for the order—that they smelled a strong odor of marijuana coming from inside his car—was a lie, and there is a genuine issue of material fact on this issue. He points to his own testimony and that of his domestic partner, who both denied the existence of the odor. He also points out that no drugs were found in his car or on his person after he was arrested.

Regardless of whether defendants smelled marijuana coming from Harris's car, this claim fails for a more straightforward reason. Specifically, officers are entitled as a matter of course to direct motorists out of their vehicles during a lawful stop, regardless of whether they suspect another crime. *Maryland v. Wilson,* 519 U.S. 408, 410 (1997). So it does not matter whether the officers smelled marijuana. It was Harris's refusal to get out of his car that caused the significant delay, so the court will grant summary judgment to defendants on this claim.

22

**D. Arrest**

Harris contends that the officer arrested him without probable cause. The officers did not verbally identify when they placed Harris under arrest, and the court of appeals has acknowledged that the moment of arrest is not always easy to identify. *U.S. v. Hill*, 818 F.3d 289, 293–94 (7th Cir. 2016). But both sides seem to assume that the officers arrested Harris when they first attempted to place him in handcuffs. When the defendant is asserting a qualified immunity defense, as the defendants are in this case, the question is whether a reasonable officer could have mistakenly believed that probable cause existed, a concept the courts refer to as "arguable probable cause." *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012).

Defendants are entitled to summary judgment on the false arrest claim because they had probable cause or arguable probable cause that Harris had committed at least five offenses. As already discussed, at the time Harris was stopped, Eddy had probable cause that Harris had engaged in reckless driving, in violation of Wis. Stat. § 346.62(2) and municipal law, and disorderly conduct, in violation of Wis. Stat. § 947.01 and municipal law. Throughout the course of the stop, officers obtained probable cause or arguable probable cause for at least three other offenses.

When he was first stopped, Harris admitted that he was not carrying his license or proof of insurance, which violates Wis. Stat. § 343.18(1) and Wis. Stat. § 344.62(2). Then Harris refused numerous orders to get out of his vehicle. That is enough to provide arguable probable cause that Harris violated Wis. Stat. § 946.41(1), which applies when anyone "knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority." Neither side cites case law from the Wisconsin state courts or the Court of

Appeals for the Seventh Circuit regarding whether disobeying an officer's order violates § 946.41. But district courts have concluded that it does. *See United States v. Bogan*, No. 17-cr-128, 2017 WL 9485688, at *2 (E.D. Wis. Sept. 26, 2017) (failure to comply with lawful order provided probable cause for § 946.41 violation); *Prip v. Erwin*, No. 14-cv-552-wmc, 2015 WL 4394526, at *5 (W.D. Wis. July 16, 2015) (same). That is enough at least for arguable probable cause. *Pullen v. House*, 88 F.Supp.3d 927, 941–42 (W.D. Wis. 2015) (refusal to obey lawful provides arguable probable cause); *Stabenow v. City of Eau Claire*, 546 F. Supp. 3d 787, 800–01 (W.D. Wis. 2021) (same).

The section of Harris's brief devoted to the false arrest claim focuses primarily on a contention that Harris did not resist the officers *after* he got out of the vehicle. But the court need not consider that issue because the officers had other grounds for arresting Harris. As for whether Harris violated § 946.41 by refusing defendants' order to get out of the vehicle, Harris's only response is that defendants "had no legal right to force Harris from his vehicle" if "there was no smell of marijuana." Dkt. 50, at 18. That's incorrect. As already noted, an officer may order a driver out of the car as matter of course during a lawful traffic stop. *Maryland*, 519 U.S. at 410.

The court will grant defendants' motion for summary judgment on the false arrest claim.

## E.  Excessive force

The basic question for an excessive force claim under the Fourth Amendment is whether the officer used "greater force than was reasonably necessary." *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016). This determination is made from the perspective of a reasonable officer in light of the totality of the circumstances known to the officer, without regard to the officer's intent or his subjective beliefs. *Williams v. Indiana State Police Dept.*, 797 F.3d 468, 472–73 (7th

Cir. 2015); *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 724 (7th Cir. 2013). In assessing reasonableness, relevant factors include the seriousness and immediacy of any threat posed by the plaintiff, the severity of any suspected crime, and the extent of the plaintiff's resistance or interference with an officer's duties. *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015).When the defendant is raising a qualified immunity defense, as defendants in this case are, the plaintiff must either "point[] to a closely analogous case that established a right to be free from the type of force the police officers used on him, or . . . show[] that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Chelios v. Heavener*, 520 F.3d 678, 691–92 (7th Cir. 2008).

Defendants move for summary judgment on two claims of excessive force: (1) Clason used excessive force by using a "push in and pull down" technique on Harris, and Eddy and Teff failed to intervene; (2) Teff used a taser on Harris, and Clason and Eddy failed to intervene. For the reasons below, the court concludes that defendants are entitled to summary judgment on the first claim but disputed fact issues preclude summary judgment on the second claim.

Defendants' opening brief does not address a third excessive force claim that is fairly raised in the complaint, which is that Clason and Eddy placed pressure on Harris's back while Harris was on the ground, restricting his breathing, and Teff failed to intervene. Defendants did discuss the claim in their reply brief, after Harris raised it in his opposition brief. The general rule is that a party may not raise an issue for the first time in his reply brief. *Adams v. Bd. of Educ. of Harvey Sch. Dist. 152*, 968 F.3d 713, 716 (7th Cir. 2020). But even if the court

considers the arguments that defendants raise in their reply brief, that there are fact issues precluding summary judgment on this claim.

### 1. Pull in and push down technique

Clason pushed Harris down onto the ground when he resisted being handcuffed. Defendants refer to this as the "pull in and push down technique."[8] The parties do not explain what that is, but another court described it as "a compliance move . . . which is designed to cause the resistive party to lose balance and go down to the ground." *State v. Russo*, 2006 WI App 194, ¶ 4, 2006 WL 2136001, at *1.[9] Harris does not allege that the technique was painful or that he was otherwise injured from Clason's use of the technique. Harris also does not dispute what is shown by the body cams, which is that he was resisting the officers' efforts to place him in handcuffs. Rather, Harris's only argument regarding this use of force is that defendants should not have been using *any* force because they did not have probable cause to arrest him.

---

[8] In his proposed findings of fact (and his brief), Harris says that Clason "threw" him to the ground. Dkt. 53, ¶ 53. To support that allegation, Harris cites the deposition testimony of the three officers, as well as Eddy's body cam, but none of that evidence supports Harris's characterization. Clason rejected plaintiff's counsel's characterization of his conduct as "tackl[ing]" Harris, saying only that he "decentralized" Harris, Dkt. 22 (Clason Dep. 97:19–98:5). The other officers also characterized the conduct using the words "decentralization" or "decentralized." Dkt. 24 (Eddy Dep. 65:25–66:2); Dkt. 23 (Teff Dep. 78:23–79:11). Eddy's body cam was too close to Harris to be helpful in determining how much force was used in pushing Harris down to the ground.

[9] The Wisconsin Department of Justice has described the technique in more detail, explaining that it involves pulling the subject forward so that he bends forward, hooking up the officer's hands behind the subject's neck, step-sliding back, pulling the subject toward the officer's chest, securing the subject's head against the officers, and pushing down on the subject's back until he is on the ground. Defensive and Arrest Tactics: A Training Guide for Law Enforcement Officers, Wisconsin Department of Justice Law Enforcement Standards Board 53 (Dec. 2014), *available at https://racinepolicereform.org/sites/default/files/inline-files/1606%20-%20%20DAAT%20 Student-Manual%202014.pdf*.

The court has already rejected Harris's argument that the officers did not have probable cause to arrest him.  Even when a suspect is engaging in only passive resistance, officers may use some amount of force to gain compliance. *Padula v. Leimbach*, 656 F.3d 595, 603 (7th Cir. 2011); *Smith v. Ball Univ.*, 295 F.3d 763, 771 (7th Cir. 2002). The court need not decide whether Clason crossed the line because Harris does not cite any case law clearly establishing that Clason's conduct violated the Fourth Amendment. So Clason is entitled to qualified immunity. That necessarily means that the other defendants cannot be held liable for failing to intervene, so the court will grant summary judgment to defendants on this claim.

### 2.  Use of taser

During the course of the arrest, Teff deployed a taser on Harris's lower back. The court of appeals classifies the use of a taser as "significant force," and the key question in determining whether an officer may use significant force such as a taser is whether the suspect is actively resisting. *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir 2018). When a suspect is not resisting or is only passively resisting, a taser is not justified. *Id.* "Examples of active resistance include kicking and flailing, declining to follow instructions while acting in a belligerent manner, and swatting an arresting officer's hands away while backpedaling." *Id.*

Defendants say that the taser was justified because Harris continued resisting while he was on the ground, and he then tried to flee once he stood up. But Harris denies that he did either of those things. *See* Dkt. 21 (Harris Dep. 62:18–64:8). The court may rely on video evidence to disregard a witness's testimony only if the video "utterly discredit[s]" that testimony. *Ferguson v. McDonough*, 13 F.4th 574, 583–84 (7th Cir. 2021). The videos in this case do not do that. They show that there was a struggle between Harris and the officers, but

the cameras are too close to Harris to clearly show the reason for the struggle, that is, whether Harris was resisting or defendants were simply using excessive force.

As for the allegation that Harris was attempting to flee, Eddy's body cam video does show Harris turning away from the officers and moving away from them. But Clasen's body cam video suggests that the taser was deployed almost immediately upon Harris standing up, immediately *before* Harris began moving away from the officers. Dkt. 39-2, at 29:55.[10]

It is clearly established that an officer may not use a taser on a non-resisting or passively resisting suspect, and there is a genuine dispute of material fact on the question whether Harris was actively resisting the officers. So the court will deny summary judgment to Teff on this claim.

Harris also contends that Eddy and Clasen can be held liable for failing to stop Teff from deploying the taser. A defendant may be held liable for failing to stop another officer's use of excessive force if the defendant had reason to know that the other officer was violating the plaintiff's constitutional rights, and the defendant had a "realistic opportunity" to prevent the violation. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). "A realistic opportunity means a chance to warn the officer using excessive force to stop." *Miller v. Gonzalez*, 761 F.3d 822, 826 (7th Cir. 2014) (internal quotation marks omitted). It is generally for the jury to determine whether the plaintiff has proven the elements for a failure to intervene. *Abdullahi v. City of Madison*, 423 F.3d 763, 773–74 (7th Cir. 2005).

---

[10] Clasen's video also shows Harris grabbing Teff's hand as Harris stands up, just before Clasen deploys the taser. Dkt. 39-2. at 29:54. In his deposition, Harris says he "tried to give Teff [his] hand" because "they was asking for my hand," and Harris "didn't want to . . . fall to the ground to get hurt." Dkt. 21, at 63:14–64:2. Defendants do not contend that Harris's act of grabbing Teff provided justification for the use of the taser, so the court need not consider that issue.

The question is a close one, but the court will allow the failure-to-intervene claim to proceed to trial. Defendants admit that Teff shouted "taser" twice in the seconds before he deployed the taser. Dkt. 52, ¶ 71. That would have given Eddy and Clasen an opportunity to at least tell Teff *not* to deploy the taser. This court has held in multiple other cases that even a few seconds of warning is enough to raise a fact question about whether another officer could have intervened. *See Stabenow v. City of Eau Claire*, 546 F. Supp. 3d 787, 799 (W.D. Wis. 2021) (collecting cases). The court will deny summary judgment to Eddy and Clasen on this claim.

### 3. Pressure on Harris's back

While Harris was handcuffed and lying prone on the ground, Eddy placed his knee on Harris's back near his shoulder blade Dkt. 28-4, at 37:12. Clason also knelt on Harris's back around the same time. Dkt. 52, ¶ 61. Harris shouted, "I can't breathe!" four times while asking defendants to get off him. Dkt. 53, ¶ 62; Dkt. 38-3 (Teff Cam 22:20–40). In response, Clason said, "If you're talking, you can breathe." Dkt. 53. ¶ 110.

Defendants do not say that they needed to kneel on Harris's back because he was continuing to resist, and they do not otherwise provide a justification for that conduct.  Rather, their only argument is that Harris "has not provided any medical records, expert reports, or other credible evidence to support the idea that he was prevented from breathing." Dkt. 51, at 11.

Defendants have misstated the relevant standard. The question is not whether defendants "prevented [Harris] from breathing;" it is whether they used "greater force than was reasonably necessary." *Becker*, 821 F.3d at 925. So Harris does not have to show that he was literally suffocating.

29

That being said, Harris has presented little evidence that defendants used excessive force on his back. The court disagrees with defendants' contention that Harris needs an expert or medical records supporting his claim. But it is far from obvious in the videos that defendants are placing great pressure on Harris's back. Harris himself could testify about the force defendants used and the effect it had on his breathing.  But Harris does not actually cite his own deposition or declaration; he relies solely on the body cam videos.

This is another close question, but the court concludes the videos are sufficient. Harris states that he cannot breathe four times. A hearsay statement is admissible to prove the truth of the matter if it qualifies as an excited utterance under Federal Rule of Evidence 803(2). A statement is an excited utterance if it meets three requirements: (1) a startling event occurred; (2) the declarant made the statement under the stress of the excitement caused by the startling event; and (3) the declarant's statement related to the startling event. *U.S. v. Zuniga*, 767 F.3d 712, 716 (7th Cir. 2014). A statement like, "I can't breathe," while an officer is kneeling on your back would appear to meet those requirements. If that statement is accepted for the truth, it is reasonable to infer that Eddy and Clasen were using unreasonable force.

The same conclusion follows for Harris's failure-to-intervene claim against Teff. It is reasonable to infer from the videos that Teff could have intervened to stop the other officers from kneeling on Harris's back.

Defendants do not raise a qualified immunity defense for this claim, so the court need not consider that issue. The court will deny summary judgment on this claim.

## F.  Strip search

Harris says that he was strip searched after he was arrested, and the strip search violated the Fourth Amendment. Harris is not suing any of the jail officers who conducted the search.

Instead, he contends that Eddy can be held liable for the search because he told jail staff that he believed that Harris may be hiding marijuana in his crotch area, even though Eddy had no reason to believe that.

A strip search of an arrestee violates the Fourth Amendment if the search is unreasonable in light of the justification for the search and the scope, manner, and place of the search. *See Henry v. Hulett*, 969 F.3d 769, 784 (7th Cir. 2020). A practice of conducting strip searches on all incoming arrestees being held in general population may be reasonable even without particularized suspicion of hidden contraband. *See Florence v. Bd. of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 324 (2012); *Fonder v. Sheriff of Kankakee County*, 823 F.3d 1144, 1146–47 (7th Cir. 2016). But if the search is targeted at an individual, then officers must have reasonable suspicion that the arrestee is concealing contraband. *Brown v. Polk Cnty., Wisconsin*, 965 F.3d 534, 540 (7th Cir. 2020).

As already discussed, defendants' opening brief does not address Harris's strip search claim, which is reason enough to deny summary judgment on the claim. But even if the court considers the arguments in defendants' reply brief, defendants have not shown that they are entitled to summary judgment.

Defendants do not contend that the strip search complied with the Fourth Amendment, either as part of a policy of searching all arrestees or as based on reasonable suspicion that Harris was concealing contraband. Eddy also does not dispute that he told jail officers that he believed Harris was hiding drugs in his crotch area. Dkt. 53, ¶ 70. Defendants' only contention is that Eddy cannot be held liable for the search because he did not participate in the search itself.

31

A defendant may be held liable for a constitutional violation even if he was not present during the violation if he otherwise *caused* the violation. *See Kuhn v. Goodlow*, 678 F.3d 552, 555–56 (7th Cir. 2012). The plaintiff must show two types of causation: (1) cause-in-fact, or whether the injury would have been prevented if the defendant had acted differently; and (2) proximate cause, or whether the plaintiff's injury was reasonably foreseeable. *See Whitlock v. Brueggemann*, 682 F.3d 567, 582–83 (7th Cir. 2012). This standard can be satisfied when one public employee influences another public employee to engage in the unconstitutional conduct. *See Taylor v. Ways*, 999 F.3d 478, 488–89 (7th Cir. 2021); *Minocqua Brewing Company LLC v. Town of Minocqua*, No. 23-cv-578-jdp, 2024 WL 2816057, at *5 (W.D. Wis. June 3, 2024); *Hennings v. Ditter,* No. 06-C-353-C, 2007 WL 5445543, at *5 (W.D. Wis. June 7, 2007). For example, in *Jones v. City of Chicago*, 856 F.2d 985, 993–94 (7th Cir. 1988), the court held that police officers who gave knowingly false reports to a prosecutor could be held liable for the charging decision that relied on those reports. That is similar to what Harris is alleging in this case.

Eddy has not shown that he is entitled to summary judgment on the strip search claim. As an initial matter, there is a genuine dispute of material fact about whether Eddy had any basis to believe that Harris had marijuana on his person. None of the defendants ever found any marijuana or paraphernalia on Harris or in his car. Eddy says that he smelled marijuana coming from Eddy's car, but Harris and his domestic partner (who was also present) deny that there was an odor. Dkt. 53, ¶ 31. The court cannot resolve that dispute on a motion for summary judgment, so the court must assume at this stage that Eddy did not have reasonable suspicion that Harris was hiding drugs and that Eddy's statement to jail officials was false.

As for the issue of causation, neither side submitted evidence from the officers who conducted the search about *why* they conducted the search. But based on the current record, a reasonable jury could find that Eddy caused the strip search. As already noted, defendants do not contend that Harris was searched as part of a blanket policy. In fact, the jail sergeant testified that arrestees generally are not strip searched in the absence of reasonable suspicion that the arrestee has a weapon or other contraband. Dkt. 32 (Dichraff Dep. 12:20–24). In the absence of other admissible evidence regarding why jail officers subjected Harris to a strip search, it is reasonable to infer that the officers relied on Eddy's statements about his suspicion that Harris was concealing marijuana underneath his clothes.

The only possible alternative explanation was offered by the jail sergeant. During his deposition, the sergeant testified that jail officers prepared a report about Harris's booking, that the report states that officers put Harris "on the body scanner," and that the officers "believed they saw a possible anomaly or object in the groin area of Mr. Harris." *Id.* at 25:4–21.[11] This testimony of the sergeant is not helpful to defendants for three reasons. First, the sergeant does not say that he has personal knowledge of the contents of the report, and defendants neither submitted a copy of the report nor identified a hearsay exception that the report would qualify under. So the testimony is not admissible. Second, the sergeant did not say that the scan was what led to the strip search. Third, the sergeant did not explain why the scan image looked suspicious, and the scan image submitted by Harris did not show any apparent anomalies. *See* Dkt. 46-6. So even if defendants had presented admissible evidence that officers searched Harris because of the scan rather than because of Eddy's statement, a

---

[11] Harris does not contend that the use of the body scanner was a Fourth Amendment violation, so the court does not consider that question.

reasonable jury would not be required to credit that evidence. Either way, a reasonable jury could find that Harris would not have been searched but for Eddy's statement.

As for whether it was reasonably foreseeable that Harris would be searched, that presumably was why Eddy told jail staff about his suspicion: to instigate a search to find the marijuana. Defendants identify no other reason Eddy would share that information. But regardless of Eddy's purpose, § 1983 is "read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe v. Pape*, 365 U.S. 167, 187 (1961). A strip search was a natural consequence of Eddy telling jail staff that he believed Harris was concealing marijuana underneath his clothes.

The court will deny summary judgment on this claim.

## G. Punitive damages

Punitive damages are available in § 1983 cases upon showing of "evil motive or intent, or . . . reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Defendants contend that Harris cannot meet this standard for any of his claims against any of the defendants.

The issue of punitive damages is moot for all the dismissed claims, and defendants forfeited the issue on claims regarding placing pressure on Harris's back and the strip search because they did not address those claims in their opening summary judgment brief. This leaves the claim regarding the use of the taser. Harris says nothing about that claim as it relates to the issue of punitive damages. Rather, he contends only that he can meet the punitive damages standard for his claim about the strip search. Dkt. 50, at 43–44. I will construe Harris's silence on the taser claim to mean that he concedes he cannot recover punitive damages on that claim.

*Cincinnati Ins. Co. v. E. Atl. Ins. Co.,* 260 F.3d 742, 747 (7th Cir. 2001) (a failure to oppose an argument permits an inference of acquiescence and "acquiescence operates as a waiver.").

The court will grant summary judgment on the issue of punitive damages on all claims except for those related to placing pressure on Harris's back and the strip search.

## ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 34, is GRANTED in part and DENIED in part. Defendants' summary judgment motion is denied on the following claims and issues:

   a. Defendants Graham Eddy, Sam Clason, and Craig Teff used excessive force against Demond Harris by deploying a taser on his lower back and placing pressure on his back, in violation of the Fourth Amendment.

   b. Graham Eddy subjected Harris to a strip search, in violation of the Fourth Amendment.

   c. Punitive damages on Harris's claims that Eddy subjected Harris to a strip search, and that Eddy, Teff, and Clason used excessive force by placing a knee on Harris's back.

   Defendants' summary judgment motion is granted on the following claims and issues:

   a. Eddy stopped Harris in violation of the Fourth Amendment.

   b. The City of La Crosse had an unconstitutional policy that caused the stop and the excessive force.

   c. Eddy extended the stop in violation of the Fourth Amendment.

   d. Eddy, Clason, and Teff, arrested Harris in violation of the Fourth Amendment.

   e. Eddy, Clason, and Teff used the pull in and push down technique on Harris in violation of the Fourth Amendment.

   f. Punitive damages on all claims other than the strip search claim against Eddy and the claim regarding pressure on Harris's back.

2.  Defendant City of La Crosse is DISMISSED, and the claim for indemnification is DISMISSED as moot.

Entered August 14, 2024.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge